**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>vs.<br><br>ANTIONE DEANDRE MAXWELL and<br>CHAVEE E'LAUN HARDEN,<br><br>　　　Defendants. | Case No. 21-cr-2013-CJW<br><br><br>**REPORT AND RECOMMENDATION**<br>**ON DEFENDANTS' MOTIONS TO**<br>**SUPPRESS** |

_____

**TABLE OF CONTENTS**

Page

I.    *INTRODUCTION*..............................................................................3

II.   *FINDINGS OF FACT*.......................................................................4

    *A.*    *The Armed Robbery on November 4, 2020* ....................................4

    *B.*    *The Traffic Stop and Foot Pursuit* .............................................5

    *C.*    *The Search Warrants* ...........................................................11

    *D.*    *Subsequent Interviews of J.B. and G.H.* ....................................12

III.  *DISCUSSION*................................................................................12

    *A.*    *Defendant Harden's Motion to Suppress* ....................................12

        *1.*    *Parties' Positions* ........................................................12

        *2.*    *Whether Entry was Justified by Probable Cause and*
             *Exigency* ..................................................................13

1

    a.  **Existence of Probable Cause** ....................................**15**

    b.  **Existence of Exigent Circumstances for Entry and a Protective Sweep** ......................................................**16**

      i.  **The Parties' Arguments** .............................**16**

      ii.  **Legal Standards** ........................................**17**

      iii.  **Analysis** ....................................................**22**

  3.  **Whether the Inevitable Discovery and Independent Source Doctrines Apply to Evidence Seized in the Warrant Search of Defendant Harden's Residence** ......................................**27**

    a.  **Inevitable Discovery** ..............................................**28**

    b.  **Independent Source** ...............................................**34**

      i.  **The Affidavits in Support of the Warrants**...........**34**

      ii.  **Legal Standards** ........................................**41**

      iii.  **Analysis** ....................................................**42**

      iv.  **Conclusion** ...............................................**46**

  4.  **The Leon Good Faith Exception** ......................................**46**

  5.  **Conclusion**...............................................................**49**

B.  **Defendant Maxwell's Motion to Suppress** ......................................**49**

  1.  **Defendant Maxwell's Argument**......................................**49**

  2.  **The Warrant**...............................................................**50**

  3.  **Analysis** ......................................................................**52**

2

      4.      ***The* Leon *Good Faith Exception*** .......................................56

      5.      ***Conclusion*** ..................................................................57

IV.    ***CONCLUSION*** ...................................................................57

## I.    INTRODUCTION

On March 17, 2021, the Grand Jury indicted Antione Deandre Maxwell on one count of Conspiracy to Interfere with Commerce by Robbery in violation of 18 U.S.C. Section 1951, one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Section 922(g)(1), and one count of Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. Section 924(c).  (Doc. 36.)  By the same indictment, the Grand Jury indicted Chavee E'Laun Harden on one count of Conspiracy to Interfere with Commerce by Robbery in violation of 18 U.S.C. Section 1951.[1]  (*Id.*)  Defendant Maxwell and Defendant Harden will be referred to collectively as "Defendants."

The matters before the Court are Defendant Maxwell's Motion to Suppress Search Warrant (Doc. 62) and Defendant Harden's Motion to Suppress (Doc. 73).  The Honorable C.J. Williams, United States District Court Judge, referred the motions to me for a Report and Recommendation.  The Government timely filed Resistances.  (Docs. 64, 79.)  I held a hearing on Thursday, July 28, 2021.  (Doc. 85.)

At the hearing, the Government offered the following exhibits, which were admitted without objection:

---

[1] In addition to Defendants Maxwell and Harden, the Grand Jury indicted Dennis Brown, Jr. ("Defendant Brown") in the same indictment.  (Doc. 36.)  Defendant Brown has not filed a motion to suppress.

1. A Search Warrant for property described as 172 W. 10th Street, Waterloo, Iowa (Gov. Ex. 1);[2]

2. A Search Warrant for a blue 2004 Chevrolet Trailblazer (Gov. Ex. 2);[3]

3. Police body camera video (Gov. Ex. 3); and

4. A Search Warrant for a silver Chevrolet Malibu (Gov. Ex. 4).[4]

The Government called two witnesses:

- Waterloo, Iowa Police Lieutenant Steven Bose and

- Waterloo, Iowa Police Lieutenant Kye Richter.

## II.    FINDINGS OF FACT

The facts that gave rise to Defendants' indictments and current motions are complicated, with relevant events occurring in at least three locations. The following facts were established from the hearing testimony of Lieutenants Bose and Richter, unless otherwise noted. I found both witnesses credible.

### A.    *The Armed Robbery on November 4, 2020*

On the night of November 4, 2020, G.H. and J.B. were victims of an armed robbery at their apartment on Shamrock Drive in Waterloo, Iowa. (Doc. 4 at 3.) J.B. told police that she and G.H. were watching Netflix at the apartment when G.H.'s friend "Vae"[5] joined them. (Doc. 79-2 at 7.) J.B. had met Vae five to six times previously. (*Id.* at 8.) G.H. did not know Vae's full name. (*Id.*) J.B. described Vae as a black male with long "dreads" that he usually wore wrapped on the top of his head. (*Id.* at 7-8.) On this evening, Vae spent approximately 30-60 minutes with J.B. and G.H., much of the time Vae on his phone. (*Id.* at 8.) G.H. told officers that Vae usually drives a dark-

---

[2] This exhibit will be cited as (Doc. 79-2).
[3] This exhibit will be cited as (Doc. 79-3).
[4] This exhibit will be cited as (Doc. 64-2).
[5] The filings contain different spellings of this nickname. Regardless of spelling, it refers to the same individual. For consistency, I will use the spelling in the warrant affidavits.

4

colored SUV but thought Vae had arrived in his girlfriend's silver Malibu that night. (*Id.* at 9.)

As Vae started to leave the apartment, two men entered wearing black ski masks and carrying guns. J.B. said, "[T]he way it happened[,] there was no way [Vae] did not see them." (*Id.* at 8.) G.H. and J.B. described both men as black and said they wore dark-colored clothing and gloves. (*Id.*) Although both men wore black ski masks, G.H. could see the man who held a gun on him had hazel or blue eyes.[6] (*Id.*) The man took G.H. to his bedroom where he "tore the room apart" looking for valuables and eventually found a bundle of approximately $1400 in cash under G.H.'s bed. (*Id.*) J.B. told officers the cash was wrapped with "a simple black hair tie." (*Id.*)

The other man pushed J.B. around the living room while holding a gun and asking her for valuable items. (*Id.*) The man grabbed the back of J.B's shirt and asked her if "she was ready to die today." (*Id.*) He took her into her bedroom and asked for valuables. (*Id.*) At one point, the man hit J.B. on the right side of her face with the gun and on the left side of her face with his open hand. (*Id.*)

The men eventually told both J.B. and G.H. to lie on their stomachs on the living room floor and count to 100 while they left. (*Id.* at 8-9.) G.H. and J.B. reported the men left in a silver vehicle. (*Id.* at 9.) The intruders took approximately $1400 cash, a Nintendo Switch, and two iPhones. (*Id.* at 8.)

### B.    *The Traffic Stop and Foot Pursuit*

That same evening, at approximately 9:40 p.m., Lt. Steven Bose, an 18-year-veteran of the Waterloo Police Department, was sitting with his lights on at the intersection of Washington Street and 15th Street where Highway 218 runs through

---

[6] This statement is attributed to "Waldo," rather than G.H., which I assume is typographical error. I agree with the Government that "Waldo" is likely a nickname for G.H. *See* (Doc. 79-1 at 13 n.4.)

Waterloo, Iowa.[7]  A blue Chevrolet Trailblazer LS drove past his patrol car in the middle lane without slowing down or moving into the left lane in violation of Iowa law.  Lt. Bose attempted to stop the Trailblazer, but the vehicle did not stop until it approached a red traffic light at Commercial Street.  As the Trailblazer stopped, the front-seat passenger opened his door and fled on foot, dropping a black object that did not appear to be heavy.  According to Lt. Bose, the front-seat passenger was a skinny black male wearing all dark clothing and dark shoes.  Lt. Bose pursued the passenger on foot.  The passenger ran fast and Lt. Bose tried to head him off on foot in the parking lot of a car dealership on Commercial near 10th Street.[8]  There are only a few houses on 10th Street. A silver vehicle backed into the driveway of the house farthest down the block and closest to the river—172 West 10th Street—momentarily caught Lt. Bose's attention while he was scanning the scene looking for the fleeing passenger.  Lt. Bose noticed a black male standing on the driver's side of the vehicle with one of the doors open.  (Doc. 79-2 at 5.) The man did not appear to be wearing dark clothing, but Lt. Bose admits he did not look very closely.  (Bose Hr'g Test.)  While pursuing the passenger, Lt. Bose had called for backup, and within a minute there were three or four officers on the scene.

Another officer eventually called Lt. Bose's attention to a black male in all-black clothing about midway down the block on 10th Street across the street from the car dealership.  This man, Defendant Dennis Brown, Jr., told Lt. Bose that he had not run from him and Lt. Bose tended to believe him, in spite of the black clothing, because Defendant Brown was not out of breath.  Nonetheless, Lt. Bose ordered Defendant Brown to the ground, handcuffed him, and then walked him to his squad car to review his vehicle video.  After reviewing the video, Lt. Bose released Defendant Brown because Defendant

---

[7] On Google Maps, it appears that the relevant part Highway 218 is also called Washington Street within in the city limits of Waterloo.

[8] Lt. Bose's patrol vehicle camera video showed the Trailblazer drive away while Lt. Bose pursued the passenger.  The video never showed the driver.

Brown was "thicker" than the man in the video, the man in the video was wearing dark blue jeans with "distress marks" or "wear marks" on the back pockets or back of the thighs and Defendant Brown was wearing jogging-style pants. Defendant Brown explained that he was in the area to visit a friend who lived on the block. Lt. Bose continued his search for the passenger.

Lt. Bose next located the blue Trailblazer about ten feet outside of the one-square block area where all of the above incidents occurred, parked at Commercial and 10th Streets. Officers looked through the open windows and observed in plain view a black ski mask, a pair of black gloves, and an iPhone. (Doc. 79-2 at 6.) Lt. Bose walked to the area where the front-seat passenger had fled. He found a pair of cotton or soft-style black gloves on the road. The black clothing, ski masks, and gloves led Lt. Bose to suspect that the people in the Trailblazer had potentially committed a robbery, although he did not have any knowledge of a robbery at the time.

Just as Lt. Bose was picking up the black gloves, the police dispatcher ("dispatch") reported that an armed robbery had occurred at G.H. and J.B.'s apartment complex. Dispatch reported that two black males wearing all black clothing with masks and "soft cloth style gloves" robbed the victims at gun point. The robbery had occurred approximately 30 to 45 minutes prior to dispatch's report. One of the suspects was described as having hazel eyes.

Lt. Bose now believed that Defendant Brown might have been connected to the Trailblazer in some way. He testified that the most common route that someone would take from the location of the robbery to destinations north would be to take Orange to 218, and would include the location where he had initiated the traffic stop. This is the most direct route. Lt. Bose described this as a "common route."

Lt. Bose and Lt. Richter started walking north on 10th Street in search of Defendant Brown. As they were walking, they were approached by a female who told

them she had found a set of keys by her vehicle on the ground. She found the keys in the same area where Lt. Bose had ordered Defendant Brown to the ground and detained him. Officers later determined that the keys belonged to the Trailblazer.

Lt. Bose and Lt. Richter continued walking and found Defendant Brown standing on the porch of 172 West 10th Street with a female later identified as R.S., Defendant Harden's girlfriend. Lt. Bose again detained Defendant Brown to question him about the robbery because 172 West 10th Street was in the "direct route" taken by the passenger who had fled the Trailblazer.

Officers learned that Defendant Harden and R.S. rent the house and that Defendant Harden was the registered owner of the Trailblazer. Officers set up a perimeter around Defendant Harden and R.S.'s residence and secured the exterior of the house.

Lt. Richter then observed movement in the house. Specifically, Lt. Richter testified that he saw what appeared to be the shadow of a person through one of the windows descend "a possible flight of stairs." Based on his understanding of the circumstances that led them to the residence, Lt. Richter testified that he believed an armed suspect may have been in the residence. He also believed the two handguns used in the robbery might be in the house. In addition, he believed the getaway vehicle, the blue Trailblazer, was "right there, at 10th and Commercial;"[9] that Defendant Brown, one

---

[9] At the hearing, Lt. Richter and Counsel for Defendant Harden had the following exchange:

| | |
|---|---|
| Q: | [A]t the time Lieutenant Bose makes the traffic stop, there's no connection between those occupants or that vehicle to the robbery, correct? |
| A. | Not at that point, no. |
| Q. | And the report from the people at the robbery was that it was a silver PT Cruiser that had left the location, correct? |
| A. | I don't know the color of the PT Cruiser. I know a PT Cruiser was mentioned. |
| Q. | And so it's fair to say that the victims of this robbery never stated a Trailblazer? |
| A. | I don't believe so. |
| Q. | And never said blue Trailblazer? |

8

of the suspects in the robbery, was apprehended on the porch of 172 West 10th Street; that because there was a time delay between the foot pursuit and when the robbery was reported, that people might have gone into 172 West 10th Street, including Defendant Brown, who was now in custody.  Lt. Bose testified that he suspected Defendant Brown participated in the robbery, either as a robber or as the getaway driver.  He also believed that there were two other suspects in the house: the passenger who fled from the Trailblazer and the unidentified man Lt. Bose saw near the Malibu when he earlier scanned the area from the car dealership looking for the passenger.  Lt. Bose did not know that man's connection to the crime, if any, but he thought he would be in the house.

R.S., who was on the front porch of the residence, asked officers if she could go inside to get her two-year-old and four-month-old children.  Lt. Bose and Lt. Richter testified that, for her own safety, for officer safety, and for the preservation of evidence, officers would not allow her back into the residence without an officer escort in spite of R.S. repeatedly telling officers she needed to go and see to her young, allegedly unattended children.  (Gov. Ex. 3 at 1:20-12:30.)  This discussion went on for approximately eleven minutes.  (*Id.*)  Officers repeatedly told R.S. they believed her

---

A.      I don't know.

This exchange is from the Court Reporter's rough draft of the transcript of the July 29, 2021 suppression hearing that was provided as a courtesy to the Court.  An official transcript of the hearing had not been entered into the docket at the time this Report and Recommendation was filed.

I note that the information related to a P.T. Cruiser may have been obtained subsequent to G.H. and J.B's initial interviews because the search warrants at issue in this case, which were obtained the day after the robbery, stated that G.H. and J.B. thought the robbers left their apartment building in "a silver vehicle."  (Doc. 79-2 at 9.)  The complaint in this case states that the robbers left their apartment in a "'boxy' SUV," although there is no citation for that information. (Doc. 4 at 5.)

boyfriend was in the house and they needed to escort her inside for the protection of everyone in the house and the officers on scene. (*Id.* at 11:40-45.)

Officers eventually escorted R.S. into the house. Immediately upon entry, Lt. Richter saw Defendants Harden and Maxwell in the living room with the four-month-old child, who was sitting in a swing. (*Id.* at 12:59.) Lt. Richter told Defendants Harden and Maxwell to place their hands on their heads. (*Id.* at 13:02.) Lt. Richter went upstairs to sweep for additional people in the residence and locate the two-year-old. After finding the child and no one else, officers arranged for R.S. to stay with the children and for Defendants to be removed from the house.

During their protective sweep of the residence to secure it for a search warrant, officers only checked in areas where people could hide. However, officers saw a bundle of currency with a band wrapped around it and two scattered black tennis shoes on a landing near the side door of the residence leading to the basement. (Doc. 79-2 at 7.) Next to the shoes was a "wood stock air rifle." (*Id.*) On a shelf directly above this landing was what appeared to be a pellet pistol or handgun. (*Id.*)

Defendant Maxwell, who originally said his name was Michael Hughes, appeared to match the physical description of the suspect who fled the Trailblazer; however, his clothing at the time of the sweep did not match the suspect's clothing. Further, Defendant Maxwell had hazel eyes, consistent with dispatch's description of one of the robbery suspects. Officers escorted Defendants Brown, Harden, and Maxwell to the Waterloo Police Station for further investigation.[10] Officers towed the Trailblazer from the scene until they could secure a warrant to search it.

---

[10] It is unclear when Defendants Harden and Maxwell were arrested. Although they were taken into custody and questioned at this time, no briefing or evidence in the record states that Defendants were arrested at Defendant Harden's residence on November 4, 2020 or after their custodial interviews.

In post-*Miranda* statements to police officers, Defendant Maxwell admitted that he had lied about being named "Michael Hughes." (Doc. 4 at 10.) He also admitted that he was the passenger who fled the Trailblazer on foot during the attempted traffic stop and that he had changed clothes at Defendant Harden's residence. (*Id.*) Defendant Harden admitted in post-*Miranda* statements that he went to J.B. and G.H.'s apartment on the evening of November 4, 2020 for the purpose of buying marijuana, and that he was present when two males burst through the front door and began to rob J.B. and G.H. (*Id.*) Defendant Harden further stated that he lent his blue Trailblazer to Defendant Brown earlier that day. (*Id.*) Defendant Harden said he received a ride to the apartment from F.A. (*Id.*) F.A. denied giving Harden a ride to the apartment. (*Id.*)

C.     **The Search Warrants**

Officers obtained State of Iowa search warrants in the late evening hours of November 4, 2020 into the early hours of November 5, 2020 for (1) Defendant Harden's and R.S.'s residence at 172 West 10th Street, Waterloo, Iowa (Doc. 79-2); (2) Defendant Harden's Trailblazer (Doc. 79-3), and (3) Defendant Maxwell's 2007 silver Chevrolet Malibu (Doc. 64-2). The warrants also authorized authorities to take buccal swabs, photographs, and the clothing of Defendants Brown, Harden, and Maxwell.

Inside Defendant Harden's residence, officers recovered, among other items, a wallet with Defendant Maxwell's state identification card; a blue hooded sweatshirt; black shoes; commercially packaged marijuana products; multiple containers with plant material; THC edibles; drug paraphernalia; three cell phones; $130.00, $1,741.00, $45.00, and $5.00 in United States currency; credit and debit cards; rubber bands; and a black hair tie with hair. (Doc. 79-2 at 11.)

Inside Defendant Harden's Trailblazer, officers recovered, among other items: a pair of black gloves, a ski mask, and a black iPhone. (Doc. 79-3 at 11.) Officers also collected five swabs from the interior of the vehicle. (*Id.*)

11

Inside Defendant Maxwell's Malibu, officers recovered the following items: a Heritage Arms Rough Rider .22 caliber revolver; an HS Produkt .45 caliber handgun; a green tote with THC oil/was [sic] products; a white garbage sack containing several packages of plant material; and blue containers with plant residue and raw papers; a receipt for THC products; and a prescription bottle with pills. (Doc. 64-2 at 11.)

## D. Subsequent Interviews of J.B. and G.H.

Early on November 5, 2020, officers conducted additional interviews with J.B. and G.H. at the Waterloo Police Station where they both identified "Vae" as Defendant Harden during photo lineups. (Doc. 4 at 9-10.) At later interviews, J.B. and G.H. admitted they had purchased the marijuana from a dispensary in Colorado that was stolen in the robbery. (*Id.* at 10.) They admitted they had intended to sell some of it in Iowa and G.H. further admitted that the cash stolen from under his bed during the robbery was proceeds from marijuana sales. (*Id.*) Video footage from the marijuana dispensary in Denver confirms that J.B. and G.H. purchased the marijuana in October 2020. (*Id.*)

## III. DISCUSSION

## A. Defendant Harden's Motion to Suppress

### 1. Parties' Positions

Defendant Harden argues that officers conducted an unconstitutional warrantless search of 172 W. 10th Street (alternatively, "Defendant Harden's house," "Defendant Harden's home," "home," or "house"). Harden contends that the protective sweep and exigency exceptions to the warrant requirement do not apply. (Doc. 73-1 at 3-6.) He claims that but for information acquired as a result of the warrantless entry into the house, the search warrants would lack probable cause. (*Id.* at 6-7.) Defendant Harden concludes that "[t]he search warrants for the residence . . . and the Trailblazer should be struck in their entirety." (*Id.* at 7.) Therefore, Defendant Harden wants the Court to suppress the

12

following items observed during the protective sweep of his residence on November 4, 2020:

1. Visual observation of Chavee Harden in the residence.
2. Visual observation of Antoine Maxwell in the residence.
3. Visual observations of currency in the residence (loose currency).
4. Visual observation of wrapped or bundled currency.
5. Black Tennis shoes.
6. Woodstock air rifle (Ruger 22 cal. Pellet rifle).
7. Pellet pistol or handgun (Crossman 2240 22 cal. pellet gun).
8. Loose $5 bill on the front porch.

(Doc. 73-2 at 1.)  Defendant Harden also seeks to suppress all items seized in the warrant searches of his home and his Trailblazer.  (*Id.* at 2-3.)

The Government responds that the officers' initial warrantless entry into, and subsequent protective sweep of, Defendant Harden's residence were lawful.  (Doc. 79-1 at 16.)  The Government posits that exigent circumstances were present.  (*Id.* at 16-17.)  The Government further asserts the officers were justified in making a protective sweep of the residence.  (*Id.* at 17-18.)  Alternatively, the Government contends that even if the officers' entry or sweep were unlawful, the officers would have inevitably discovered the items in Defendant Harden's residence and Trailblazer.  (*Id.* at 18-21.)  The Government also argues that if the warrants lacked probable cause due to their reliance on information illegally obtained during the protective sweep, the warrants still support probable cause after information learned during the sweep is excised from them.  (*Id.* at 18-21.)  Finally, the Government argues that even if the excised warrants do not support probable cause, officers relied in good faith on the search warrants, making suppression unnecessary under *United States v. Leon*, 468 U.S. 897, 920 (1984).  (*Id.* at 21-23.)

### 2.    *Whether Entry was Justified by Probable Cause and Exigency*

The Fourth Amendment to the United States Constitution provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures, shall not be violated[.]" Therefore, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal quotation marks omitted)). Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. U.S. Dist. Ct. E. Dist. Mich., S. Div.*, 407 U.S. 297 (1972) (internal quotation marks omitted)). "When a warrantless entry and search is conducted in a home, the government bears the burden of proving that an exception to the warrant requirement applies." *United States v. Hatcher*, 441 F. Supp. 3d 723, 739 (N.D. Iowa 2020) (citing *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir. 1980)).

"Exigency is a recognized exception to the warrant requirement." *Id.* (citing *Kleinholz v. United States*, 339 F.3d 674, 676 (8th Cir. 2003)). "The exigent circumstances exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012) (quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996) (alteration omitted)). Although, "exigency may be substituted for a warrant, . . . probable cause must be present before either a warrant or exigency will allow a search." *Kleinholz*, 339 F.3d at 676.

"The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). Courts consider "the circumstances that confronted police at the time of entry" to determine whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of

14

a crime would be found in a particular place." *Kleinholz*, 339 F.3d at 676 (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

However, "[e]xigency does not inherently exist . . . merely because there is probable cause to believe that a serious crime has been committed." *Hatcher*, 441 F. Supp. 3d at 739 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984); *United States v. Neadeau*, No. 17-CR-173 (SRN/LIB), 2018 WL 301192, at *9 (D. Minn. Jan. 5, 2018)).

The Government argues that "'a legitimate concern for the safety of individuals' and '[t]he risk that evidence will be destroyed during the time required to obtain a search warrant' can constitute exigent circumstances." (Doc. 79-1 at 16 (quoting *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007); *Leveringston*, 397 F.3d at 1116 (brackets in original).)

### a. Existence of Probable Cause

Probable cause existed for a warrantless entry into Defendant Harden's house because, given the totality of the circumstances, a reasonable person could believe there was a fair probability that suspects from the armed robbery were in the house. One suspect was found on the property, which meant at least one, possibly two suspects were still at large and because a silver Malibu was found in the driveway, which was the same type of vehicle that J.B. and G.H told officers Defendant Harden's girlfriend drove and that Defendant Harden had arrived in before the armed robbery. J.B. and G.H. told officers that Vae (Defendant Harden) left in a silver vehicle. Officers also had evidence—

black gloves, a mask, and Defendant Maxwell's flight from Lt. Bose in dark clothing—that a Trailblazer belonging to Defendant Harden, who lived at the residence, was associated with the armed robbery. Defendant Harden was still unaccounted-for. I also note that, taken together, the timing of the robbery and getaway, the route of travel of the Trailblazer, and the path of the fleeing passenger help focus probable cause on the residence.

In addition, despite R.S.'s insistence that her children were alone inside the residence, Lt. Richter saw the shadow of someone walking down the stairs inside the house. These facts not only provided probable cause to believe that evidence of a crime would be found in the residence, but also that the evidence could be lost or destroyed if not immediately secured. I find that officers had probable cause to believe that evidence of a crime would be found in the residence and that the evidence was at risk of being lost or destroyed if not immediately secured.

### b. Existence of Exigent Circumstances for Entry and a Protective Sweep

#### i. The Parties' Arguments

The Government contends that "it could [have] take[n] several hours to obtain a search warrant"[11] and that this presented a risk to R.S.'s unattended four-month-old infant. (Doc. 79-1 at 17.) The Government expanded this argument to include "the kids" during the hearing. The Government also argues that because Lt. Richter had noticed unexplained movement in the house, it was reasonable to believe evidence would be destroyed if officers did not enter and secure the house. (*Id.*) At the hearing, the

---

[11] It is unclear exactly what time officers applied for the warrant, but it would have been sometime after 10:00 p.m. In its brief, the Government states that warrant searches were conducted "in the late evening hours of November 4, 2020 and the early morning hours of November 5, 2020." (Doc. 79-1 at 7.)

Government asserted two more reasons justifying the warrantless entry into the residence: (1) if R.S. was to be believed, there were two unattended children in the residence who would have to remain alone for hours while officers waited for a warrant and (2) because officers suspected there were firearms and suspects in the residence, officers surrounding the residence were at risk while awaiting a warrant because the possibly armed suspects could shoot at the officers at any time.

The Government also asserts that it needed to conduct a cursory protective sweep to "secure the premises for safety" given the suspected presence of persons who could pose a danger to officers in the residence, particularly the danger of ambush while executing a search warrant for a dangerous crime; the suspected presence in the residence of unaccounted-for firearms used in the armed robbery; and R.S.'s apparent lie that her children were alone in the house. (Doc. 79-1 at 17-18 (citing *Maryland v. Buie*, 494 U.S. 325 (1990).)  In short, the Government argues "that it was necessary to secure the premises for safety" and that officers could not wait for a warrant to do so.  (*Id.* at 18.)

Defendant Harden maintains that the residence "was fully secured and surrounded on all sides by law enforcement, including lights and a multitude of officers; such negating any necessity of a protective sweep as the location was fully secured to incredible levels."  (Doc. 73-1 at 6.)

### ii.      Legal Standards

 "An exception to the warrant requirement permits an officer to enter a home if he or she acts with probable cause in the presence of exigent circumstances." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005) (citation omitted). "To determine whether the safety of officers or others justifies a warrantless entry, courts must focus objectively "'on what a reasonable, experienced police officer would believe.'" *Hatcher*, 441 F. Supp. 3d at 739 (quoting *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)).  "[T]he exigent circumstances rule applies when the police do not gain entry

to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 469 (2011). "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *Leveringston*, 397 F.3d at 1116 (citing *Welsh v. Wisconsin,* 466 U.S. 740, 750 (1984); *Schmerber v. California,* 384 U.S. 757, 770–71 (1966)). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence . . . will imminently destroy evidence." *Ramirez*, 676 F.3d at 760 (citing *United States v. Clement*, 854 F.2d 1116, 1119 (8th Cir. 1988)). The inquiry is objective and asks, "whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citation omitted).

Under the community caretaking exception to the warrant requirement, upon which the Government relies, officers may enter a residence if they possess a "reasonable belief that an emergency exists requiring his or her attention." *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing *Mincey v. Arizona,* 437 U.S. 385 (1978); *United States v. Nord,* 586 F.2d 1288, 1291 n.5 (8th Cir. 1978)). This includes a reasonable belief that children are alone and in danger. *See United States v. Sallis*, No. 17-CR-2017-LRR-1, 2017 WL 2819973, at *7 (N.D. Iowa June 29, 2017) (holding that warrantless entry to check on welfare of unsupervised children was constitutional, especially since there was risk of unsecured firearm in the home), *R. & R. adopted*, 2017 WL 3388184 (N.D. Iowa Aug. 7, 2017), *aff'd*, 920 F.3d 577 (8th Cir. 2019). Reasonable belief "is a less exacting standard than probable cause." *Id.* (internal alterations and citation omitted).

The community caretaking exception was recently declared by the United States Supreme Court to be narrower than some courts had assumed. *Caniglia v. Strom*, 141 S.

Ct 1596, 1599–1600 (2021). In *Caniglia*, officers entered the home of the petitioner and seized his handguns the morning after he asked his wife to shoot him with one of the guns. 141 S. Ct. 1596, 1598. The petitioner claimed officers violated the Fourth Amendment when they entered his home and seized his firearms without a warrant. *Id.* The district court granted summary judgment to the officers and the First Circuit affirmed based on the community caretaking exception to the warrant requirement. *Id.* In a unanimous decision, the Supreme Court vacated the judgment, noting that "what is reasonable for vehicles is different from what is reasonable for homes." *Id.* at 1600. The Court reasoned,

> We have . . . held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Kentucky v. King*, 563 U.S. 452, 460, 470, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011); *see also Brigham City v. Stuart*, 547 U.S. 398, 403–404, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (listing other examples of exigent circumstances). And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability. *E.g.*, *Jardines*, 569 U.S. at 8, 133 S. Ct. 1409 (approaching a home and knocking on the front door).

> The First Circuit's "community caretaking" rule . . . goes beyond anything this Court has recognized. The decision below assumed that respondents lacked a warrant or consent, and it expressly disclaimed the possibility that they were reacting to a crime. The court also declined to consider whether any recognized exigent circumstances were present because respondents had forfeited the point. Nor did it find that respondents' actions were akin to what a private citizen might have had authority to do if petitioner's wife had approached a neighbor for assistance instead of the police.

*Id.* at 1599.

Although *Caniglia* was a unanimous decision, three concurrences discussed situations in which warrantless entries still are or may be constitutional. Two of them are particularly relevant.

Fifteen years ago, this Court unanimously recognized that "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Brigham City v. Stuart*, 547 U.S. 398, 406, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). A warrant to enter a home is not required, we explained, when there is a "need to assist persons who are seriously injured or threatened with such injury." *Id.*, at 403, 126 S. Ct. 1943; see also *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (per curiam) (warrantless entry justified where "there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger" (internal quotation marks omitted)). Nothing in today's opinion is to the contrary. . . .

*Id.* at 1600 (Roberts, C.J., concurring).

I join the Court's opinion in full. I write separately to underscore and elaborate on THE CHIEF JUSTICE's point that the Court's decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and in need of aid. *See ante*, at 1600 (ROBERTS, C. J., concurring). For example, as I will explain, police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide or to help an elderly person who has been out of contact and may have fallen and suffered a serious injury.

.   .   .

Consistent with that reality, the Court's exigency precedents, as I read them, permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reasonable to act now. *See, e.g., Sheehan*, 575 U.S. at 612, 135 S. Ct. 1765; *Michigan v. Fisher*, 558 U.S. at 48–49, 130 S. Ct. 546; *Brigham City*, 547 U.S. at 406–407, 126 S. Ct. 1943. The officers do not need to show that the harm has already occurred or is mere moments away, because knowing that will often be difficult if not impossible in cases involving, for example, a person who is currently suicidal or an elderly person who has been out of contact and may have fallen. If someone is at risk of serious harm and it is reasonable for officers to intervene now, that is enough for the officers to enter.

.   .   .

To be sure, courts, police departments, and police officers alike must take care that officers' actions in those kinds of cases are reasonable under

20

the circumstances. But both of those examples and others as well, such as cases involving unattended young children inside a home, illustrate the kinds of warrantless entries that are perfectly constitutional under the exigent circumstances doctrine, in my view.

*Id.* at 1602-05 (Kavanaugh, J., concurring).

Thus, it appears that while "caretaking," alone, is not sufficient justification for a warrantless entry, something akin to "exigent caretaking" still justifies a warrantless entry.

The Government argues that *Caniglia* had not yet been decided at the time of the entry and thus it could not undermine their belief that the warrant was valid under *Leon*. (Doc. 79-1 at 22.) Even if *Caniglia* does not affect the *Leon* analysis, it nevertheless is binding, if applicable, in determining whether the entry was constitutional. In June 2021, the United States Supreme Court vacated judgment and remanded a case from this Court to the Eighth Circuit for further consideration in light of *Caniglia*. *See Sanders v. United States*, 141 S. Ct. 1646 (2021). The incident leading to the charges in *Sanders* occurred in 2018. *United States v. Sanders*, 4 F.4th 672, 675 (8th Cir. 2021). On remand, *Sanders* held that officers had an objectively reasonable basis to enter a domestic violence victim's home based on the presence of the defendant—her suspected abuser—and the officers' belief it was necessary to render emergency assistance to young children, one of whom was at a heightened risk of danger because she called for assistance and one of whom they could hear crying. *Id.* at 677-78; *see also United States v. Hewitt*, No. 7:21-CR-00003, 2021 WL 2416979, at *3, *5 (W.D. Va. June 14, 2021) (granting defendant's motion to suppress in case where warrantless entry occurred on March 12, 2020 and finding no facts fit under a *Caniglia* exception because "[t]here was no information that property or persons in the hotel room were in distress or in need of protection or that any emergency at all existed").

21

Therefore, it is still appropriate to analyze whether officers' warrantless entry into Defendant Harden's residence fits under an exception discussed in *Caniglia* or *Sanders* or under whether some other recognized exigent circumstance existed at the time of the entry.

"Upon legally entering a residence, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (citing *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *United States v. Walsh,* 299 F.3d 729, 733 (8th Cir. 2002)). "A protective sweep is limited to a cursory inspection of spaces where a person may be found and may not last longer than is necessary to dispel the reasonable suspicion of danger." *Id*. "A protective sweep is proper even if the potential individual being searched for is unidentified." *Hatcher*, 441 F. Supp. 3d at 740-41 (citing *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)).

### iii. *Analysis*

I first find that officers' warrantless entry into Defendant Harden's home on November 4, 2020 was justified whether or not they believed R.S.'s statements that the children—an infant and a toddler—were alone in the house. Reasonable officers in the positions of Lieutenants Bose and Richter and their fellow officers could have believed that the children would be alone for hours while waiting for a warrant. If officers believed R.S. and thought that no one was in the house with the children, they at least suspected that the house might contain evidence of the armed robbery, including unaccounted-for firearms, which could result in catastrophic results if found by children while officers waited for a warrant. Officers' suspicion that the home contained firearms was reasonable under the circumstances. Lieutenants Bose and Richter testified that it takes up to eight hours to write warrant affidavits in complicated cases with multiple victims

22

and witnesses when people are still being interviewed. Lt. Bose testified that the children would have been alone inside all that time. According to R.S., the baby was not wearing any clothes. (Gov. Ex. 3 at 9:16.) Even *Caniglia* and *Sanders* allow warrantless entries to protect unattended children. 141 S. Ct at 1605 (Kavanaugh, J., concurring); 4 F.4th at 677-78; *see also Sallis*, 2017 WL 2819973, at *7 (warrantless entry to protect unattended children alone in apartment that might contain a firearm justified under community caretaking function).

In the alternative, and more likely, officers did not believe the children were alone because Lt. Richter had seen the shadow of someone walking down the stairs. Therefore, officers had reason to suspect that the children were in the company of at least one person who likely possessed a firearm that was recently used to commit an armed robbery. Although this is not identical to the situation presented by the children who were with a suspected domestic abuser in *Sanders*, armed robbery and domestic abuse are both serious crimes against persons, and it was reasonable for officers to think the children needed protection. *Sanders*, 4 F.4th at 675 (detailing children's mother's demeanor and injuries officers could see on her face and neck). Both of these scenarios constitute "*Caniglia* exceptions" of the kind that were missing in *Hewitt* where no person or property was in need of protection. Although officers did not necessarily have the fear of an imminent attack directed at the children in this case that the officers did in *Sanders*, *Id.* at 675, 677, they did have a reasonable concern for their safety. Officers had a reasonable belief that an unsecured firearm was in the house with the young children or that the children were in the house with at least one person who had recently threatened people with a gun. Officers also knew that this situation would continue for hours while they waited for a warrant because they were not going to let R.S. into the house unaccompanied.

At the hearing, Defendant attempted to distinguish *Sallis* because in that case, the defendant was caring for young children at the time of his arrest, which resulted in the

children being left alone in an apartment until their mother returned, while here, R.S. was available to care for her children. That is true. Officer Bose told R.S. she could go inside and care for her children. (*E.g.* Gov. Ex. 3 at 10:31.) He just told her that she could not go inside unescorted by law enforcement, who still had the same concerns regarding the children's safety that the officers did in *Sallis*. 2017 WL 2819973, at *7. However, unlike in *Sallis*, officers told R.S. they believed Defendant Harden, whom they believed was associated with the armed robbery, was in the residence, which added a level of urgency to the situation that was not present in *Sallis*. (*Id.* at 4:48, 10:53.) Therefore, I find that the warrantless entry was constitutional under *Caniglia*.

Moreover, even if the District Court does not agree that the warrantless entry constituted an exception to *Caniglia*, I further find that exigent circumstances justified the warrantless entry and protective sweep of the house to find persons who could pose a danger to officers who would eventually execute the anticipated search warrant.

> The [exigent circumstances] exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Cisneros–Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citations omitted). The lives that are threatened include those of the police officers themselves. *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996); *United States v. Clarke*, 564 F.3d 949, 958 (8th Cir. 2009). To determine whether exigent circumstances justify a warrantless entry or search, courts must objectively consider the circumstances that confronted the police at the time of the entry. The consideration is that of a reasonable, experienced police officer. *Cisneros–Gutierrez*, 598 F.3d at 1004. "Police officers are able to conduct a protective sweep search pending an application for a search warrant when there is a risk that evidence will be destroyed. Police may also be justified in conducting a warrantless search where probable cause and exigent circumstances exist." *United States v. Jansen*, 470 F.3d 762, 765 (8th Cir. 2006) (citations omitted).

*United States v. Camberos-Villapuda,* No. CR. 13-40104, 2014 WL 12665782, at *6 (D.S.D. Aug. 22, 2014) (affirming protective sweep of home to secure it for search

warrant), *R. & R. adopted*, 2014 WL 12665721 (D.S.D. Sept. 11, 2014), *aff'd*, 832 F.3d 948 (8th Cir. 2016).

Here, the threat of ambush was real, as it was in *Camberos-Villapuda* where officers were outside and an unknown number of suspected drug cartel members were inside the house. *Id.* Reasonable officers could believe that an ambush of officers executing a warrant was possible because they believed armed robbers were in the house and they knew the firearms used in the robbery could be present. Moreover, although Defendant Harden argues that the police presence *outside* his home obviated the need for a protective sweep inside his home, the dangerous nature of the crime officers were investigating; that firearms and suspects from that crime were still unaccounted for; that Lt. Richter saw a shadow indicating the presence of at least one person—possibly one of the armed robbery suspects; and that at times R.S. seemed more concerned with keeping officers out of her home than with reuniting with her children indicated that the danger was *inside* the house, not outside the house. Moreover, I find the Government's arguments that not only ambush when officers were executing the warrant, but also officer safety while awaiting the warrant was a legitimate reason to enter and conduct a protective sweep of the residence. (The persons who robbed G.H. and J.B. held guns to the victim's heads and asked J.B. if she was ready to die today.) Officers armed with this knowledge were justified in believing that a protective sweep was necessary because the facts supported their reasonable belief that some person in the residence posed a danger to officers. *See Maryland v. Buie*, 494 U.S. 325, 334 (1990).

Finally, exigent circumstances also justified officers in making a warrantless entry protective sweep to prevent the destruction of evidence. "[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought" is constitutional. *Segura v. United States*, 468 U.S. 796, 810 (1984). *Segura* based its holding on the difference between the possessory interest at stake

in a seizure of property and the privacy interest at stake in a search of that same property. *Id.* at 810 (securing a dwelling to await a search warrant after the residents had been arrested); *see also Camberos-Villapuda*, 2014 WL 12665782, at *6. Here, the shadow Officer Richter saw and the facts that had already led to R.S.'s home and officers' reasonable suspicion that Defendant Harden was in the house gave officers a "a sufficient basis . . . to believe that somebody in the residence . . . [would] imminently destroy evidence." *Ramirez*, 676 F.3d at 760.

In the case at bar, I have already determined that officers had probable cause for a warrantless entry. Although all officers intended to do was "get the kids out of there" and "check anywhere that an adult person could be at" (Bose Hr'g Test.), upon entry, officers immediately encountered Defendants Harden and Maxwell and took them into custody, although whether they were formally arrested at that time is unclear. (*Id.*) There was at least circumstantial evidence tying Defendants to the armed robbery. In addition to Defendant Harden's Trailblazer containing evidence connected to the robbery, Defendant Maxwell matched the description of the suspect who fled the Trailblazer: Defendant Maxwell has hazel eyes, one of the distinguishing characteristics noted by the armed robbery victims. (Doc. 79-2 at 8.) Thus, even if Defendants were not arrested, I find that there was enough evidence tying Defendants to the residence and to the crime officers were investigating to justify securing the residence while awaiting a search warrant. *Cf Segura*, 468 U.S. at 800 (defendant arrested prior to securing apartment); *see also Camberos-Villapuda*, 2014 WL 12665782, at *6 (officers removed two individuals during warrantless entry and protective sweep, but did not search house until they received warrant).

Moreover, the items stolen from G.H and J.B.'s apartment were small and readily subject to destruction or disposal: cash; cell phones; and a hand-held video game. *See Leveringston*, 397 F.3d at 1116 (the risk of destruction of evidence during the time it

takes to wait for a warrant can constitute an exigent circumstance). As discussed above, officers believed that there was at least one other person in the residence with the children. (Bose Hr'g Test.)[12] This individual would have had hours to tamper with and/or destroy evidence while waiting for officers to enter with a search warrant. I find that officers reasonably believed that several reasons justified a warrantless entry into Defendant Harden's home, including protection of the children and the need to preserve evidence. Once inside the house, officers were justified in conducting a protective sweep to protect officers currently outside the residence and those who would eventually conduct the warrant search; to prevent the destruction of evidence; and to protect the children, who remained in the home with R.S. after Defendants Harden and Maxwell were removed from the home.

### 3. Whether the Inevitable Discovery and Independent Source Doctrines Apply to Evidence Seized in the Warrant Search of Defendant Harden's Residence

The Government contends that even if the warrantless entry and protective sweep of Defendant Harden's residence violated the Fourth Amendment, Defendant Harden's motion should be denied because the evidence would have been inevitably discovered by virtue of a search warrant they were already planning. The Government argues that "officers would have applied for the warrant had they not acquired the tainted

---

[12]

Q: So it was your belief then that [R. S.] was being untruthful with you about the occupants?
A: Yes.
Q: And did you have any ability to affirm that there were, in fact, other adult individuals in that residence?
A: Prior to making entry, the only reason to believe that there was other people in there would have been Lieutenant Richter's –– the movement that he saw going from the up to the down. I did not see any of it though.

(Bose H'rg Test.)

information. Officers had already discussed and planned on preparing the search warrants prior to entering defendant Harden's residence." (Doc. 79-1 at 19.) After this process, officers would have discovered what they eventually found in Defendant Harden's residence and Trailblazer.

> "[T]he distinction between the independent-source and inevitable-discovery doctrines is not sharp, *see, e.g.*, *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004) (expressing uncertainty regarding "which [doctrine] rules this case"), where exactly one draws the line between the two doctrines is unimportant. . . . Provided that the evidence would have been acquired lawfully if the unlawful search had not occurred, admitting the evidence puts the government in the same position that it would have occupied if the unlawful search had not occurred.

*United States v. Baez*, 983 F.3d 1029, 1037 (8th Cir. 2020), *cert. denied*, No. 20-8014, 2021 WL 2302094 (U.S. June 7, 2021).

### a. Inevitable Discovery

> To have evidence that was obtained after a constitutional violation admitted into court, the government must show that it was not obtained "by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Evidence is purged of taint and should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

*United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (alterations in original).

The inevitable discovery doctrine allows the admission of evidence that would have been discovered even without a constitutional violation. *Utah v. Strief*, 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams*, 467 U.S. 431, 443-44 (1984)); *Hogan v. Kelley*, 826 F.3d 1025, 1028 (8th Cir. 2016).

> We have held that this inevitable discovery exception applies when the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered

by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Conner,* 127 F.3d 663, 667 (8th Cir. 1997).

*McManaman*, 673 F.3d at 846; *United States v. Maccani*, No. 20-CR-90-CJW-MAR, 2021 WL 943109, at *24 (N.D. Iowa Mar. 12, 2021) (quoting *Hogan*, 826 F.3d at 1028). "In this analysis, 'it is important to focus not on what the officers actually did after unlawfully recovering evidence, but on what the officers were reasonably likely to have done had the unlawful [entry] not occurred.'" *McManaman*, 673 F.3d at 846 (quoting *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1020 (8th Cir. 2003)).  For the inevitable discovery doctrine to apply, the Government must prove not only that the evidence would have been discovered by lawful means, but also that the officers were "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  *Id.*  For example, in *McManaman,* the Eighth Circuit held that child pornography seized in a search of defendant's home did not have to be suppressed because drug paraphernalia found on the defendant's person when he was arrested would have given officers enough probable cause to obtain a search warrant that would have ultimately led to the discovery of the pornography.  *Id.* at 847-48.  *Baez* is instructive regarding how the inevitable discovery doctrine applies in cases where officers are not investigating two distinct crimes like they were in *McManaman*.

> Our caselaw on the inevitable-discovery doctrine divides into two strands. The first strand aligns with the view that the Supreme Court has endorsed since *Nix*. On this view, in order for evidence acquired unlawfully and not reacquired lawfully to be admissible under the inevitable-discovery doctrine, it is sufficient that the evidence would have been acquired lawfully but for the constitutional violation. *See Nix*, 467 U.S. at 444, 104 S. Ct. 2501 (holding that "evidence that would inevitably have been discovered" is admissible because excluding it would "put the government in a worse position" than "if no misconduct had taken place"); *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (reiterating

that "a necessary . . . condition for suppression" is "that a constitutional violation was a 'but-for' cause of obtaining [the] evidence"). From our adoption of the inevitable-discovery doctrine in *United States v. Apker*, 705 F.2d 293 (8th Cir.), *rev'd in part on other grounds en banc*, 724 F.2d 633 (8th Cir. 1983), until our decision in *United States v. Conner*, 127 F.3d 663 (8th Cir. 1997), we articulated the doctrine in a way that is consistent with this view. *See, e.g.*, *Apker*, 705 F.2d at 306 (holding that the inevitable-discovery doctrine "allows illegally obtained evidence to be admitted if it would have been discovered in the course of a proper investigation"); *United States v. Durant*, 730 F.2d 1180, 1185 (8th Cir. 1984) (holding that the inevitable-discovery doctrine applies "when the evidence would have been inevitably discovered absent the illegal conduct"); *Hamilton v. Nix*, 809 F.2d 463, 465-66 (8th Cir. 1987) (en banc) (explaining that evidence is admissible under the inevitable-discovery doctrine if "it inevitably would have been discovered by lawful means" and stating that "there is no reason to exclude . . . evidence" if "police misconduct is not even a 'but for' cause of its discovery"); *United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995) (quoting *Hamilton*).

In *Conner*, however, we held that the inevitable-discovery doctrine applies only if the government shows not only (1) "that the evidence would have been discovered by lawful means in the absence of police misconduct" but also (2) "that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." 127 F.3d at 667; *cf. United States v. Thomas*, 524 F.3d 855, 860-62 (8th Cir. 2008) (Colloton, J., concurring) (pointing out the differences between the Supreme Court's approach in *Nix* and our approach in *Conner*).

Since *Conner*, our practice has been inconsistent. In some cases, we have repeated *Conner*'s two-condition test. *See, e.g.*, *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998) (citing *Conner*); *Thomas*, 524 F.3d at 858 (citing *Glenn*); *United States v. Munoz*, 590 F.3d 916, 923 (8th Cir. 2010) (citing *Thomas*). In other cases, we have repeated the one-condition test from *Nix* and our earlier caselaw. *See, e.g.*, *United States v. Reinholz*, 245 F.3d 765, 779 (8th Cir. 2001) (citing Eighth Circuit caselaw prior to *Conner*); *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (citing *Nix*); *United States v. Sallis*, 920 F.3d 577, 582-83 (8th Cir. 2019) (citing *Nix*). In one case, we even applied the inevitable-discovery doctrine despite acknowledging that there was no contemporaneous alternative line

of investigation. *See United States v. Chandler*, 197 F.3d 1198, 1201 (8th Cir. 1999).

The uncertainty in our caselaw regarding the inevitable-discovery doctrine does not stand in the way of our application of that doctrine here. We already explained in Section II.A.1 why the evidence found under the sink satisfies the test from *Nix* and our earlier caselaw. Therefore, our application of the inevitable-discovery doctrine here is proper unless *Conner*'s test is controlling. And even if *Conner*'s test is controlling, our application of the inevitable-discovery doctrine here is proper if *Conner*'s second condition is met. Because either possibility— that *Conner* is not controlling or that *Conner*'s second condition is met— would be sufficient to support our application of the inevitable-discovery doctrine here, we need not decide which is true. It is enough to conclude that at least one is true. And we know that at least one is true because, prior to *Conner*, we applied the inevitable-discovery doctrine in a case where it was less plausible than it is here that a contemporaneous alternative line of investigation was present.

That case is *Durant*, 730 F.2d 1180. In *Durant*, the defendant—charged with bank robbery—challenged the admission of evidence that he drove a blue Oldsmobile, which the police had acquired by unlawfully interrogating him while arresting him for an unrelated offense. *Id.* at 1184-85. The police did not realize the significance of the car until "[l]ater," "when [the defendant] was linked to the bank robbery." *Id.* We held that the evidence was admissible under the inevitable-discovery doctrine because, if the police had not known already that the defendant drove a blue Oldsmobile, then they would have found out by tracing the driver's license and traffic citation that they had obtained from the defendant when he was arrested. *Id.* at 1185.

It is more plausible that a contemporaneous alternative line of investigation was present here than in *Durant*. In *United States v. Hammons*, we held that it was enough to constitute "actively pursuing a substantial, alternative line of investigation" for officers to have in mind "an alternative plan" that they would have executed if the constitutional violation had not occurred. 152 F.3d 1025, 1030 (8th Cir. 1998). Here, Officer Gruber conceded that it did not "occur" to him "to go and . . . get a warrant" when he and the other officers arrived at the suite, and it was not until he "found the meth" under the sink that he "wanted to get the warrant." But Officer

Gruber also testified that he "understood that [getting a warrant] was an option" when he asked Gavino's consent to search the room, and he "would have . . . called for a search warrant" had Gavino refused to consent. This implies that Officer Gruber was at least disposed to execute an alternative plan if Gavino refused to consent, even if he did not consciously have such a plan in mind. In *Durant*, by contrast, the officers had no reason to suspect that the defendant had participated in a robbery involving a blue Oldsmobile when they arrested him. Hence, there is nothing to indicate that they were disposed to trace the driver's license and traffic citation in search of a blue Oldsmobile if the defendant refused to answer their questions—much less that they consciously had such a plan in mind. *See Durant*, 730 F.2d at 1185 ("[The defendant's] connection to the blue Oldsmobile would have been inevitably discovered *once the officers became aware of [his] alleged participation in the bank robbery*." (emphasis added)).

The fact that it is more plausible that a contemporaneous alternative line of investigation was present here than in *Durant* shows that either *Conner*'s second condition is met here or else *Conner* is not controlling. On the one hand, if a contemporaneous alternative line of investigation was present in *Durant*, then *a fortiori* a contemporaneous alternative line of investigation was present here, too. In that case, our application of the inevitable-discovery doctrine here would be proper because *Conner*'s second condition would be met. On the other hand, if a contemporaneous alternative line of investigation was not present in *Durant*, which applied the inevitable-discovery doctrine anyway, then *Conner*'s second condition conflicts with prior-panel precedent. In that case, our application of the inevitable-discovery doctrine here would be proper because *Conner* would not be controlling. *See Mader*, 654 F.3d at 800 (holding that, in the event of "conflicting panel opinions, the earliest opinion must be followed"). In sum, whether because *Conner*'s second condition is met or because *Conner* is not controlling, circuit precedent supports our application of the inevitable-discovery doctrine here.

*Id.* at 1038–40 (all alterations in original; footnote omitted).

In the instant case, evidence linking Defendant Harden to the armed robbery of G.H. and J.B. already gave officers enough probable cause to obtain the search warrants that ultimately would have led to the discovery of all the evidence Defendant Harden now seeks to suppress. Lt. Bose believed Defendant Harden was in the house. (Gov. Ex. 3

32

at 4:50.)  Lt. Bose testified that when they found Defendant Brown at the house, they immediately established a perimeter around the house because they thought the two other suspects could be inside that house or inside K.M.'s house and that he was going to apply for a warrant.  Lt. Richter also said officers decided to apply for a warrant before he even saw movement in the house.  Therefore, I find that the Government has met its burden under the first prong of this analysis and has established by a preponderance of the evidence that the information found during the protective sweep "ultimately or inevitably would have been discovered by lawful means." *McManaman*, 673 F.3d at 846 (quoting *Nix*, 467 U.S. at 444).

In addition, the Government satisfied the second prong of the analysis because it has shown officers were engaged in an alternative line of investigation at the time of the alleged constitutional violation.  Unlike in *Baez* and *Durant*, Lieutenants Bose and Richter were actually seeking a search warrant for the house and I do not need to speculate about that line of investigation.  Under *Baez* and *Durant*, a search warrant constitutes an alternative plan—an alternative line of investigation.  Moreover, officers were engaged in a protective sweep for individuals who posed a danger to the children or officers or who could destroy evidence; they were not looking for evidence.  *See United States v. Thomas*, 524 F.3d 855, 859 (8th Cir. 2008) (alternative line of investigation in murder investigation was whether defendant was the suspect, which justified continued *Terry* stop in spite of illegal search of defendant's pocket).  Officers only looked in places where people could hide.  R.S. accompanied Lt. Bose on his sweep, which insured he did not turn the sweep into a search.  Defendant has submitted no evidence indicating that Lt. Bose or any other officer overstepped the limits of a protective sweep.  Therefore, under *Connor*, the strictest inevitable discovery test, I find that even if the warrantless entry was illegal, officers would have inevitably discovered the evidence in Defendant Harden's home.

Case 6:21-cr-02013-CJW-MAR   Document 92   Filed 10/01/21   Page 33 of 58

### b.      Independent Source

The Government argues in the alternative that the search warrant for the house constituted an "independent source." (Doc. 79-1 at 19.) "Two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *United States v. Swope*, 542 F.3d 609, 613-14 (8th Cir. 2008). If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. However, if the warrant with the information redacted still contains a substantial basis for probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Id.* at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

I have already found that officers were planning to apply for a warrant before entering Defendant's home. Therefore, the first prong of the analysis is satisfied. Accordingly, if the District Court determines I am wrong about the inevitable discovery doctrine, I must review the warrant affidavits with the tainted information removed.

### i.      The Affidavits in Support of the Warrants

At the hearing, the parties agreed to three paragraphs of the affidavits in support of the search warrants that should be excised because the paragraphs contained information learned during the protective sweep.[13] I find that the excised warrants still

---

[13] I have omitted additional information that refers to the excised paragraphs from the following narrative. Specifically, I have omitted the following information:
- The sentence stating "Brow[n], Harden and Hughes were all transported to 715 Mulberry Street for further investigation" on page 7 of Doc. 79-2.
- All information from the paragraph beginning, "Upon watching the in car video . . ." on page 7 of Doc. 79-2;

34

provide a substantial basis from which a judge could find there was probable cause for the search of Defendant Harden's residence and Trailblazer. (Doc. 79-2 at 5-10.)[14] [15]

The affidavits in support of the warrants were signed by Investigator Brice Lippert of the Waterloo Police Department. The excised affidavits state the following:

> On Wednesday November 4, 2020 Waterloo Police Department Lt Bose was working a traffic project from 1845hrs to 2245hrs. During this project at approximately 2140hrs he was sitting stationary on northbound Hwy 218 near W 15th Street. He was sitting in the right hand lane with his rear emergency lights activated. A Blue Chevy Trailblazer LS with Iowa Registration number JHP575 drove past his vehicle without reducing their speed and stayed in the middle lane while the left lane was completely open. The driver had the ability to move the vehicle over or slow his speed down but failed to do so. Lt Bose followed the vehicle to initiate at traffic stop for Failure to Move.
>
> The vehicle stopped at 11th and Washington before turning right on 11th Street. Lt Bose activated his emergency lights to stop the vehicle. The vehicle failed to come to a stop and continued passed [sic] Jefferson Street. Lt Bose hit his air horn but the vehicle still didn't stop. The vehicle eventually stopped at 11th and Commercial Street. The front seat passenger of the Trailblazer immediately exited the vehicle and fled on foot. As the

---

- Everything except the first sentence of the paragraph beginning, "[J.S.] added that she stayed in her room . . . ." on page 9 of Doc. 79-2;
- The words "and Maxwell" from the paragraph beginning, "Based on the above listed facts. . . ." on page 9 of Doc. 79-2; and
- All information from the paragraph beginning, "Your affiant also believes that due to the fact that Harden and Maxwell were located. . . ." on page 9 of Doc. 79-2.

All excisions are shown with ellipses or with the notation "[Rest of paragraph excised.]".

[14] All citations to the affidavit are to the affidavit in support of the search warrant for Defendant Harden's residence. (Doc. 79-2.) The identical affidavit was submitted in support of the search warrant for Defendant Harden's Trailblazer. (Doc. 79-3.) To streamline the narrative, I have only cited to the affidavit in support of the warrant for the residence, but the information contained in that affidavit also pertains to the warrant to search the Trailblazer because the two affidavits are identical.

[15] It is unclear to me if the warrants in this case were signed by a judge or a magistrate. The signature line says "Magistrate/Judge" with no typed name. The judicial officer who signed the warrants used only his or her initials. I use the term "judge" throughout my analysis.

passenger got out of the vehicle Lt Bose was able to observe that he was a thinner black male wearing a dark hooded sweatshirt, dark pants, and black shoes. As he got out of the vehicle a black object fell from his lap onto the street near the front passenger door. The suspect then fled from the vehicle heading northwest towards the C&S II parking lot.

Lt Bose exited his vehicle and began to pursue the suspect on foot. The suspect ran along the north side of the business heading towards W. 10th Street. Lt Bose ran along the south side of the business in an attempt to cut the suspect off. As Lt Bose got to the southwest corner of the business he looked to the north and he could no longer see the suspect. Lt Bose advised he was last seen heading in the northwest direction towards the rear yard of 73 W. 10th Street.

While Lt Bose was searching the area he observed a male subject standing on the driver's side of a silver 2007 Chevrolet Malibu, IA plate IWG703 with what appeared to be the driver's side open. This vehicle is registered to Antione Maxwell and was parked at 172 W 10th Street.

Several officers arrived in the area to assist in looking for the suspect. Within a few moments Officer Albers advised on the radio that a subject was walking on W. 10th Street from the area of Commercial. Lt Bose observed this subject and thought it was the subject that fled on foot. Lt Bose turned his flashlight on him and ordered him to the ground.

The male, later identified as Dennis Brown, complied with Lt Bose's commands and was detained. Brown was observed wearing dark pants, a dark sweater and a black hat. Brown was walked back to Lt Bose's squad car where Lt Bose reviewed the video of the subject running from the Trailblazer.

While reviewing the video Lt Bose determined that Brown was not the passenger who fled on foot due to him wearing dark jogging pants and having a heavier build than the passenger who ran. While reviewing the video at this time he also noted the passenger who ran was wearing jeans that had distinct markings (scuffmarks/wear marks on both backs of the thighs and the back pockets area of the pants.) Lt Bose also observed that the suspect vehicle turned left onto Commercial Street moments after Lt Bose ran past the vehicle while pursuing the suspect.

36

After determining that Brown was not the passenger who ran he was released from handcuffs. Brown informed officers that he was just walking in the area to a friend's house and hadn't seen anyone running prior to our contact. Several officers stayed in the area and continued to check for the suspect that fled on foot. Lt Bose located the suspect vehicle on Commercial Street just west on W 10th Street. Lt Bose went out with the vehicle and found it to be unoccupied with the windows down. A small open container of alcohol was sitting on the driver seat as well as a black Iphone. Also in the vehicle was a black ski mask on the front passenger seat as well as gloves in the back seat passenger side on a child car seat. Lt Bose went back to the area of the traffic stop and picked up the black gloves which were still lying on the roadway where the suspect fled from the passenger seat.

As Lt Bose was picking up the gloves, Black Hawk County Dispatch advised of an armed robbery that just occurred at 1333 Shamrock Drive #4. Dispatch[] advised that two black males with masks robbed the victims at gun point. Dispatch further advised that one of the suspects was wearing black cotton cheap gloves which appeared to be the same gloves that fell from the suspect's lap during Lt Bose's foot pursuit from the traffic stop. Dispatch also advised that one of the suspect [sic] had hazel eyes.

Believing that the robbery was connected to the Trailblazer Lt Bose requested additional officers. Lt Richter arrived at 10th and Commercial and began walking down 10th Street towards the river with Lt Bose. As they were walking in the area they were approached by an unknown white female who was in the area of 186 and 188 W 10th Street. She informed them she had located a set of keys by her vehicle on the ground. This was in the exact area where Lt Bose had initial contact with Brown and where Brown was taken into custody. It was later found that these keys belonged to the Trailblazer from the traffic stop. Lt Richter and Lt Bose continued to walk on 10th Street and saw Brown standing on the Porch of 172 W. 10th Street with a female who was later identified as [R.S.]. Lt Bose and Lt Richter detained Brown and escorted him back to a squad car.

In speaking with [R.S.] officers learned that she rents 172 W. 10th Street and is also the girlfriend of Chavee Harden who is the registered owner of the Trailblazer from the traffic stop. During this time Lt Richter advised

37

that there was movement in the residence and a perimeter was set up at 172 W. 10th Street as Lt Richter continued communications with [R.S.] and her brother [D.S.]. As they were talking [R.S.'s] mother [K.M.] came walking up from 73 W. 10th Street.

Lt Bose spoke with [K.M.] and she informed him that she was in her house sleeping when she was woken up by officer's lights walking through her yard as they searched for the subject that ran on foot. Lt Bose asked [K.M.] if anyone has entered her house prior to officers making contact with he [sic] and she stated no. [K.M.] advised that officers could check her residence. Prior to doing a consent search of 73 W. 10th Street Officers cleared 172 W. 10th Street in order to secure it for a search warrant.

.   .   .

Once 172 W. 10th Street was clear, Lt. Bose and Officer Nelson went to 73 W. 10th Street to conduct a consent search/protective sweep of the location for people. [K.M.] went along and during this time officers saw a soft zipper handgun case. [K.M.] said she didn't have any guns in the house and the case didn't belong to her.

The Trailblazer was towed from the scene to Lab Processing. [Rest of paragraph excised.]

.   .   .

During this time Waterloo Police Department officers made contact with J.B. and G.H. who were the victims of the robbery. Both subjects agreed to come to the Waterloo Police Department for interview.

Inv Zubak interviewed J.B. and she advised G.H and her were watching Netflix at their apartment when Vae came over. She described Vae as a black male who has dreads wrapped up in a bun on top of his head and is a friend of G.H. She said she has met him five to six times and he was at the apartment for 30-60 minutes during which he was spending time on his phone. She also said he talked about having some problems with people and talking about people biting the hand that feeds them.

J.B. said when Vae was getting ready to leave he started going out the front door when two people came in with guns. She said the way it happened there was no way Vae did not see them. J.B. said she was pushed around the living room by one of the males while he asked her for valuable items. She described the male as wearing dark clothing with cheap black gloves and thought the gun he had was a two-toned revolver. She said the male with her asked her if she was ready to die today while grabbing the back of her shirt. J.B. said the male eventually took her back to her room and asked for valuables.

J.B. said she was next led to the living [sic] and told to get on her stomach, told not to move and told to count to 100. She said G.H. eventually got up and locked the doors. J.B. said that because their phones were taken they were unable to call 911 immediately and had to use a neighbor's phone.

J.B. told Inv Zubak that during the robbery the male dealing with her got mad and hit her on the side of her right side of her neck with the gun and the left of her face with an open hand.

J.B. was asked about the money that G.H. gave to the suspects. She said the money was from part of her student loan and was combined with G.H. money. She said the money was kept together with a simple black hair tie and thought it was around $1,400.00. She also advised the males also took some marijuana that was on the table.

J.B. was shown a photo line-up that did contain a picture of Harden with his hair down. After looking at the pictures she stated she did not recognize anyone. A Facebook photo was located of Harden with his hair up and shown to J.B. Upon seeing this picture J.B. identified the picture of Harden as Vae.

Investigator Saad interviewed G.H. at the Waterloo Police Department. G.H. stated that he was at his apartment with his roommate, J.B., and friend. G.H. identified his friend as Vae but did not know his full name. G.H. stated when Vae was leaving two males entered the apartment with firearms. The males walked past Vae and Vae left the apartment. G.H. described both males as being black with dark colored clothing, gloves and black ski masks. G.H. described one of the males as having hazel or blue eyes and the other male had brown eyes.

G.H. said the males had a dark green grocery style bag and began demanding items from J.B. and him. G.H. stated the male with blue or hazel eyes pointed a black handgun at him. G.H. thinks the males took a Nintendo Switch, both of their cell phones and money.

G.H. said J.B. and he were directed to the ground prior to the males leaving the apartment. After the males left they looked out the window and thought the males got into a silver vehicle.

Inv Saad showed G.H. a photo lineup containing Harden. G.H. identified the picture of Harden as Vae. G.H. also stated that Vae typically drives a dark colored SUV but thought he had shown up in a silver Malibu belonging to Vae's girlfriend.

Inv. Jurgensen met with [R.S.] at 172 W. 10th Street. During this conversation [R.S.] informed him that she refers to her boyfriend Harden as Vae. [R.S.] said around 1730 to 1800 hours Harden left to get food at Tokyo Bay. When returned with food they began to eat in their room on the second floor. While eating Harden says he was going to let his friends borrow his blue SUV. [R.S.] advised Inv Jurgensen she knows the friends to be Maxwell (Twan) and Brown (Sip).

[R.S.] said after eating Harden left the house. She advised it was her belief that Maxwell and Brown were outside waiting for Harden to give them the keys and they leave. Inv Jurgensen asked how Harden left and she said she was unsure but said he has other friends that drive.

[R.S.] added that she stayed in her room all night until she saw police lights and went outside to see what was going on. [Rest of paragraph excised.]

Inv. McFarland spoke with [K.M.] at 73 W 10th Street. [K.M.] said she was sleeping when she was woken up by flashlights and police outside her house. She said she made contact with officers who told her they were looking for some people and she went back inside her house.

[K.M.] said a short time later a guy she only knows as "Sip" knocked on her door. She said Sip asked her to use her cell phone to call his wife and she let him. She said Sip used the phone and then hung out at her house for

a little bit. She said she finally told him he needed to leave and he left. She said she thought Sip was wearing all black and was around her age.

Based on the above listed fats [sic] it is your affiants [sic] belief that Harden, Brown and Maxwell were involved in the robbery at 1333 Shamrock Drive #4. It is also your affiant's belief that Harden's Chevrolet Trailblazer, IA plate JHP575 was used to transport them to and from the robbery and may contain evidence of the crime.

. . .

(Docs. 79-2 at 5-9; 79-3 at 5-9.)

Based on these facts, Lt. Bose attested that he believed Defendants were involved with the robbery of G.H. and J.B's apartment and that Defendant Harden's residence and Trailblazer would contain evidence of the crime. (*Id.*)

### ii. Legal Standards

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*,

41

757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir. 1993)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (citations omitted). Defendant bears the burden of proving the warrants were issued without probable cause. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109 (1965) (citation omitted).

### iii.    *Analysis*

The warrants provided a substantial basis from which the judge could find there was a fair probability that contraband would be found in Defendant Harden's Trailblazer.

The affidavit documents (1) an armed robbery was perpetrated by assailants in dark clothing, masks, and gloves who used handguns; (2) the victims of the armed robbery identified Defendant Harden as "Vae," G.H.'s friend who was allowed to walk out of their apartment as the robbery began; (3) Defendant Harden's girlfriend, R.S., also calls him "Vae;" (4) Lt. Bose later saw a ski mask and a pair of black gloves through the windows of a Trailblazer he had previously tried to stop and found another pair of black gloves at the site of the traffic stop where a suspect fled the Trailblazer[16]; (5) Lt. Bose also saw an iPhone in the Trailblazer and the robbers had taken the victims' cell phones; (6) Defendant Harden owns the Trailblazer and had loaned "his blue SUV" to Defendants Brown and Maxwell earlier that evening; (7) Defendant Brown was wearing dark clothing and a black hat when he first encountered Lt. Bose and K.M. thought Defendant Brown (Sip) was wearing all black when he came to her house and used her cellphone; (8) Lt. Bose had ordered Defendant Brown to the ground in the same place where a citizen found the keys to Defendant Harden's Trailblazer; (9)  the site of the traffic stop was on the route that was the "most common" route" for someone to take from the site of the armed robbery to get to other routes out of town; (10)  the armed robbery occurred 30-45 minutes prior to when Lt. Bose heard the call from dispatch, which, in conjunction with the rest of the evidence, could lead a reasonable officer to conclude that the Trailblazer was leaving the robbery when it passed Lt. Bose on Highway 218; and (11) Defendant Brown had been in K.M.'s house after the robbery and a handgun case was subsequently found in K.M.'s house that K.M. denied owning, which meant that the handgun that belonged in the case was still unaccounted for.  Therefore, the warrant provided a fair

---

[16] It bears repeating that when Lt. Bose attempted to stop the Trailblazer with emergency lights, the Trailblazer did not immediately stop.  When it did stop, a passenger fled.  While Lt. Bose chased the passenger on foot, the Trailblazer left the scene of the attempted traffic stop and was later located elsewhere.  These facts are apparent from the warrant and support probable cause for its eventual search.

43

probability that contraband or evidence of the armed robbery would be found in the Trailblazer. *See Kail*, 804 F.2d at 444.

The warrants also provided a substantial basis from which the judge could find there was a fair probability that contraband would be found in Defendant Harden's house. In addition to all the information just discussed, which also applies to the warrant for the house, the affidavits also established the following: (1) a silver Chevrolet Malibu belonging to Defendant Maxwell was parked in Defendant Harden's driveway and Lt. Bose had seen a man standing by it with the door open; (2) the victims of the armed robbery told officers they thought their assailants had left in a silver vehicle; (3) G.H. said he thought Defendant Harden had arrived at the site of the armed robbery in a silver Malibu; (4) Defendant Maxwell had loaned his "blue SUV" to Defendants Maxwell and Brown that evening; (5) R.S. told law enforcement that she believed Defendants Maxwell and Brown were outside waiting for Defendant Harden to bring them the keys at the time Defendant Harden lent them the vehicle; (6) Defendant Harden is the registered owner of the blue Trailblazer involved in the traffic stop; and (7) Lt. Richter saw movement in Defendant Harden's house, which an officer could reasonably infer meant someone was inside. *See United States v. Waters*, 883 F.3d 1022, 1026 (8th Cir. 2018) (finding protective sweep constitutional even though subject of arrest warrant was arguably in custody prior to sweep because, *inter alia*, officers observed window blinds move in windows on two different floors within a short period of time prior to entering home).

In conclusion, Defendant Harden was identified as Vae, a man who perhaps "set up" the armed robbery or at least seemed to know the robbers because they let him leave. Defendant Brown, who was dressed like the robbers that night, and who had borrowed Defendant Harden's "blue SUV" earlier in the evening, was found at Defendant Harden's home and had been lying on the ground where Defendant's Trailblazer's keys were found. Defendant Brown had also been at K.M.'s house after the robbery but before it was

searched.  Officers found a handgun case in the house that K.M. did not recognize. The people who robbed G.H. and J.B. threatened them with handguns.  Defendant Maxwell's silver Malibu was found at the house. Defendant Harden reportedly arrived at the site of the robbery in a silver Malibu.  The robbers reportedly left the site of the robbery in a silver vehicle.  Defendant Harden had lent his blue SUV to Defendants Brown and Maxwell, who probably met him at his home to get the keys and the vehicle. It was logical for the judge to infer that the blue SUV was the same vehicle as the Trailblazer. *See Keele*, 589 F.3d at 944 ("Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant.").  Finally, movement was detected inside the house, which a reasonable judge could infer meant there was someone in the house.  I find that the warrants established a "nexus between the contraband and the place[s] to be searched." *Tellez*, 217 F.3d at 550.

Not only were the affidavits sufficient, the evidence seized "was the product of [warrant] searche[s], wholly unrelated to the prior entry. The valid warrant searche[s] [were] a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry." *Segura*, 468 U.S. 796, 814 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).[17]  Accordingly, I find that a preponderance of the evidence supports the conclusion "that there was a reasonable probability that the evidence would have been discovered by lawful means even without [any] constitutional violation" the

---

[17] Defendant Harden does not appear to ask the Court to analyze whether the full versions of the warrants provide a substantial basis from which the judge could find probable cause for the searches at issue.  At the hearing, Defendant Harden argued only that a warrant was required for the initial entry into his home and that the community caretaking exception did not apply.  To the extent Defendant Harden argues that the full versions of the warrants do not provide such a substantial basis, for the reasons set forth above, I find they do.  The additional information only makes the warrants more compelling.

District Court may find. *Maccani*, 2021 WL 943109, at *24 (internal quotation marks omitted).

### iv. Conclusion

Accordingly, even if the Court determines that the inevitable discovery or independent source doctrines do not make the information gleaned from the unwarranted entry admissible and therefore information seen during the entry is tainted, the Court should still conclude that the warrants are supported by probable cause. As such, any evidence seized pursuant to the warrants need not be suppressed.

### 4. The Leon Good Faith Exception

I have recommended the Court find a substantial basis supports the judge's findings of probable cause for the warrants.[18] However, if the Court disagrees with this conclusion, it should nevertheless hold that the *Leon* good faith exception applies.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

> Under *Leon*'s good-faith exception, the Fourth Amendment exclusionary rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is

---

[18] *See id.*

ultimately found to be invalid." *United States v. Taylor*, 119 F.3d 625, 629 (8th Cir. 1997) (citing *Leon*, 468 U.S. at 905, 922-23). "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916.

Courts have applied the *Leon* good faith exception when . . . the search warrant application cites information gathered in violation of the Fourth Amendment. *See, e.g.*, *United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (finding that the *Leon* good faith exception applied to the search warrant even if the officers lacked reasonable articulable suspicion to detain defendant long enough to conduct a dog sniff); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) ("[E]vidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid."). For the *Leon* exception to apply when a warrant is based on evidence obtained through a Fourth Amendment violation, the officers' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (quoting *White*, 890 F.2d at 1419). If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Id.* (quoting *United States v. O'Neal*, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994)).

*United States v. Zarate*, No. 18-CR-2073-CJW-MAR, 2019 WL 3459236, at *6 (N.D. Iowa July 31, 2019).

Defendant Harden does not expressly rely on *Leon*. However, he did argue in his brief that he was entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) because officers were not justified under the community caretaking exception to the warrant requirement to enter his house and conduct a protective sweep. (Doc. 73-1 at 6-7.) He asserted that because information seen during the protective sweep was included in the affidavits in support of the warrants, the warrants should be struck in their entirety. (*Id.* at 7.) Defendant waived his right to a *Franks* hearing at the suppression hearing, but during oral argument reiterated his argument under *Caniglia*, 141 S. Ct. at

Case 6:21-cr-02013-CJW-MAR    Document 92    Filed 10/01/21    Page 47 of 58

1599–1600 that there is no longer a community caretaking exception to the warrant requirement. I interpret this as not only a general argument about the exception, but also as a *Leon* argument. Thus, I will analyze whether the protective sweep, if found unconstitutional, was still "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *Zarate*, 2019 WL 3459236, at *6 (quoting *Conner*, 127 F.3d at 667).

I reiterate that at the time of November 4, 2020 search, *Caniglia* had not been decided and the community caretaking exception to the warrant requirement appeared to apply to searches of homes. *See Quezada*, 448 F.3d at 1007 ("A police officer may enter a residence without a warrant as a community caretaker where the officer has a reasonable belief that an emergency exists requiring his or her attention."); *Sallis*, 2017 WL 2819973, at *7 (warrantless entry to protect unattended children alone in apartment that might contain a firearm justified under community caretaking function). As discussed above, R.S. told officers that her infant and toddler were alone in the house and that her infant was not wearing any clothes. Lieutenants Bose and Richter both testified that a warrant application in a complicated case takes hours to write. Lt. Bose estimated writing a warrant application takes anywhere from two-to-eight hours, depending on the complexity of the case. Officers suspected there were firearms in the house because firearms had been used in the robbery of G.H. and J.B. Officers were not going to let R.S. into the house unaccompanied, even to care for her children. (Gov. Ex. 3 at 10:30.) Thus, the only way to keep the very young children from being in the house alone for hours, possibly with firearms, was to enter the house with R.S. prior to obtaining the warrant.

Officers did not believe R.S., but rather thought there was at least one person in the house because Deputy Richter saw movement in the house. Therefore, officers suspected that the children were in the house with at least one person who may have

recently committed an armed robbery. Therefore, officers' fears were, arguably, heightened because not only were the children in the house, possibly with firearms, but also perhaps with at least one person who had already threatened people at gunpoint that night. Therefore, officers had even more reason to reunite the children with their mother, but to do so in a manner that allowed them to keep everyone safe, including officers outside the house. *See Camberos-Villapuda,* 2014 WL 12665782, at *6 (considering exigent circumstances exception to the warrant requirement and finding warrantless entry justified considering threat potentially violent home residents could cause to officers). Part of keeping everyone safe was conducting a protective sweep of the house. Officers also wanted to preserve evidence.

Under these circumstances, I find that even if the District Court finds the protective sweep unconstitutional, the sweep was still "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *Zarate*, 2019 WL 3459236, at *6. Accordingly, a reasonably well-trained officer would not have known any subsequent warrant searches were illegal despite the judge's issuance of the warrants. *See Lopez-Zuniga*, 909 F.3d at 909.

### 5.    *Conclusion*

For all of the above reasons, I recommend denying Defendant Harden's Motion to Suppress. (Doc. 73.)

### B.    *Defendant Maxwell's Motion to Suppress*

### 1.    *Defendant Maxwell's Argument*

Defendant Maxwell argues that the affidavit in support of the search warrant for his silver Malibu was "so clearly lacking in any indicia of probable cause as to render official belief in its existence unreasonable because the information therein was solely based upon a 'hunch' by law enforcement." (Doc. 62-1 at 2.) Defendant Maxwell explains that there is "nothing in the affidavit that shows any connection of the Malibu to

the robbery or the transportation of Defendants to the house at 172 W. 10th Street," and therefore, it is merely a "hunch" that the vehicle was "used to transport them to and from the robbery and may contain evidence of a crime." (*Id.* at 3.)

### 2. *The Warrant*

Investigator Lippert also signed the affidavit in support of the warrant for the search of the Malibu. The affidavit is identical to the warrants quoted above, except that house numbers and addresses are excised. *See* part III.A.3.a, *supra*. Since Defendant Maxwell does not have standing to challenge the items found in the protective sweep, the entire warrant can be considered in his case, not just the excised version. Thus, along with the excised version set forth above in part III.A.3.a, this additional information may be considered: [19]

> While securing the residence in preparation for a search warrant officers observed two males sitting/laying in the living room of the residence along with a small infant. These males were identified as Harden and Antoine Maxwell. Also in the living room Lt Richter observed some loose US currency and what appeared to be a wad of US currency with a band wrapped around the money.
>
> As the house was checked for additional persons, Officers observed two scattered black tennis shoes on a landing near the side door of the residence leading to the basement. Next to the shoes near the side door was a wood stock air rifle. Directly above this landing was a shelf. On the shelf was what appeared to be a pellet pistol or handgun. All these items were in plain view as officers went down the stairs to the basement of the residence.

---

[19] Defendant Maxwell does not claim he has standing to challenge the validity of the protective sweep. Therefore, it may be that Defendant Maxwell was not an overnight guest in Defendant Harden's home, but merely a short-term guest who was in the house with Defendant Harden's permission and did not have a privacy interest in the house. *See Minnesota v. Carter*, 525 U.S. 83, 90 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."); *United States v. Sturgis*, 238 F.3d 956, 958 (8th Cir. 2001) (explaining *Carter's* holding).

Harden and Maxwell were detained and Maxwell appeared to match the description of the suspect that fled my[20] traffic stop except his clothing had changed. Maxwell also had hazel eyes consistent with what the victims of the robbery had earlier advised dispatch.

. . .

Brow[n], Harden and Hughes[21] were all transported to 715 Mulberry Street for further investigation.

Upon watching the in car video from Bose's traffic stop closer it appears that the suspect that ran from the Blazer had what appeared to be a balding spot on the back of his head. At the Waterloo Police Department Lt Bose found that Maxwell had initially provided a false name. When questioned him about his real identity.[sic] Maxwell started to provide another false name but eventually gave his proper name. Lt Bose asked Maxwell to look down so he could see the back of his head. While looking at the back of his head Lt Bose saw that he had [sic] patch on the back of his head that looked like it was balding. In this area were stitches he advised he received after being shot in the back of the head in Mason City.

(Doc. 64-2 at 7.)

[R.S.] said when the police did a safety sweep in her house the [sic] located Harden in the basement. She said she did not know he was inside but said he does smoke cigarettes in the basement.

(*Id.* at 9.)

In addition, the final paragraph quoted in conjunction with the warrants for Defendant Harden's home and Trailblazer is modified in one respect. In the affidavit for the warrant for the Malibu, the final sentence says, "It is also your affiant's belief that Harden's Chevrolet Trailblazer, IA plate JHP575 and Antonie [sic] Deandre Maxwell's

---

[20] The affidavit includes the following footnote: "This appears to be a typo. The undersigned believes 'my' should be 'Lt Bose.'" I agree with this assessment.

[21] The affidavit includes the following footnote: "This appears to be a typo. As noted above, defendant Maxwell initially identified himself as 'Michael Hughes.'" I agree with this statement.

silver Chevrolet Malibu IA plate IWG70 was used to transport them to and from the robbery and may contain evidence of the crime." (*Id.*)

### 3. Analysis

The rules for reviewing a warrant for a substantial basis to support probable cause are stated in part III.A.3.b, *supra*. The Eighth Circuit recently summarized the task in the following way:

> Though establishing probable cause "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338, 134 S. Ct. 1090, 188 L. Ed. 2d 46 (2014), it still requires "a showing of facts" that "create a fair probability that evidence of a crime will be found in the place to be searched," *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008) (per curiam) (quotation marks omitted). Our task when reviewing search warrants after the fact is to determine whether the judges who approved them had "a substantial basis for concluding that probable cause existed." *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (internal quotation marks omitted).

*United States v. James*, 3 F.4th 1102, 1104–05 (8th Cir. 2021). Here, the judge relied solely on the affidavit, and therefore only information contained within the four corners of the warrant will be considered when reviewing whether there was a substantial basis from which the judge could determine probable cause existed for the warrant. *See Farlee*, 757 F.3d at 819.

I find that the Malibu warrant provides facts that create a fair probability that evidence of a crime will be found in the vehicle. The warrant documents an armed robbery and a suspect's flight from a traffic stop. The warrant ties Defendant Maxwell to the armed robbery with the following facts:

(1) an armed robbery by two black males wearing dark clothing, gloves, and masks, one of whom had hazel eyes; the robbers stole an estimated $1400 in cash bound together with a black hair tie, cell phones, and marijuana;

(2) Defendant Maxwell has hazel eyes, like one of the robbers;

(3) The victims thought the robbers left in a silver vehicle;

(4)     G.H., one of the victims, thought Vae, who was allowed to walk out the door by the robbers, arrived at the apartment that evening in a silver Malibu;

(5)     "Vae" is the nickname of Defendant Harden, whose Trailblazer was the subject of a failed traffic stop after the armed robbery;

(6)     When the Trailblazer was stopped, Defendant Maxwell, who was wearing all dark clothing, like the robbers, fled on foot, dropping something from his lap as he fled;

(7)     The Trailblazer contained evidence of a robbery in plain view: an iPhone, black gloves, and a black face mask;

(8)     At the spot where Defendant Maxwell fled the Trailblazer, Lt. Bose found another pair of black gloves;

(9)     The keys to the Trailblazer were found at the location where Defendant Brown was briefly detained on the ground;

(10)    Defendant Brown was later located at Defendant Harden's house;

(11)    During Lt. Bose's search for the fleeing passenger, he saw a male subject standing next to the Malibu with the driver-side door open;

(12)    The Malibu and Defendant Maxwell were both found at Defendant Harden's house where items consistent with those used during the robbery and those taken during the robbery were observed in plain view; and

(13)    Defendant Maxwell matched the description of the man seen on Lt. Bose's squad car video who fled the traffic stop.

These facts establish a fair probability that contraband or evidence of a crime would be found in the Malibu. *Kleinholz*, 339 F.3d at 676. Defendant Maxwell matched the description of one of the robbers and matched the description of the passenger who dropped black gloves as he fled the Trailblazer. The Trailblazer itself contained evidence of a robbery. In addition, G.H. stated that he thought Defendant Harden arrived at his

apartment that night in a silver Malibu and both G.H. and J.B. told officers they thought they saw their assailants leave in a silver vehicle. The use of two vehicles by the three Defendants is further corroborated by Lt. Bose's observation of a male subject standing beside the Malibu with the driver's side door open, while it appears that Defendants Brown and Maxwell were in the Trailblazer: Maxwell due to Lt. Bose's identification and Brown due to the presence of the dropped keys in the exact location where he had recently been on the ground. Based on the totality of the circumstances described in the warrant, the judge was justified in drawing the reasonable inference that evidence of the armed robbery would be found in Defendant Maxwell's silver Malibu. *Keele*, 589 F.3d at 944 ("Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant . . . .") (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (noting *Alexander* quoting *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)).

Defendant Maxwell's citations to *United States v. Hogan*, 25 F.3d 690 (8th Cir. 1994) and *United States v. Arredondo*, 996 F.3d 903 (8th Cir. 2021) are unavailing. In *Hogan*, a confidential informant contacted DEA agents to say that the defendant, an auto plant employee, was selling methamphetamine and marijuana at the plant. *Id.* at 691. After interviewing several employees who stated they had purchased methamphetamine and marijuana from the defendant at the plant and that the defendant always transported the drugs to work in his white Dodge pickup, and confirming that the confidential informant witnessed three hand-to-hand drug transactions, agents applied for two warrants: one for the defendant's house and one for his pickup, which the confidential informant said was the only vehicle the defendant drove to and from work. *Id.* On the day agents planned to execute the warrants, the defendant assured people he would bring the drugs to work for his shift that began at 3:00 p.m. *Id.* Agents intercepted the defendant driving a car at 12:40 p.m. about five miles from home. *Id.* at 692. Agents

54

obtained a search warrant for the car and seized contraband.  *Id.*  In spite of this, the Government argued that agents could have searched the car without a warrant pursuant to the automobile exception.  *Id. Hogan* held that agents had no probable cause to stop and subsequently search the car because all the information in the original warrant said the defendant only drove his pickup to work, only transported drugs to work in the pickup, and was not to begin selling drugs until his 3:00 shift, which was nowhere near the time he was intercepted.  *Id.* at 693.  The car was not even mentioned in the warrant.  *Id.*  Thus, *Hogan* held that the warrant was not issued upon probable cause: "At most, the agents had a hunch that the drugs from the house or truck might be in the [car]. The prerequisite to a valid search under the automobile exception, however, is probable cause, not a hunch."  *Id.*

Defendant's case is distinguishable from *Hogan* because Investigator Lippert's affidavit contains much more than a hunch that the Malibu would contain evidence of the armed robbery.  As discussed above, one of the robbery victims specifically mentioned "a silver Malibu" and both victims mentioned their assailants leaving in a silver vehicle. The Malibu was originally seen with its door open in the driveway of the home rented by the owner of another vehicle in which items of the type associated with the robbery were found.  More items of the type associated with the robbery were found in the house, as was the Malibu's owner, who fled from that second vehicle when confronted by law enforcement, dropping gloves of the type associated with the robbery on the way out of the vehicle.  Thus, the affidavit contained more than a hunch that the Malibu would contain evidence of the robbery.

Defendant Maxwell cites *Arredondo* for the proposition that "[f]or an item's 'incriminating character' to be 'immediately apparent,' the officer must have probable cause to associate it with criminal activity."  996 F.3d at 907 (finding no probable cause to associate "small glass containers that looked similar to containers that hold common

household items, such as contact lenses, essential oils, or medications for insulin or fertility" with contraband when officers had no idea of their contents) (citation omitted). I presume Defendant Maxwell cites this case to downplay the incriminating character of evidence such as the dark clothing, dark gloves, and ski masks, all of which could have innocent explanations. Each of these items, taken by itself, could have an innocent explanation. However, warrants are judged on the totality of the circumstances. *Kail*, 804 F.2d at 444. Under the totality of the circumstances documented in this warrant, black gloves, black clothing, and a ski mask was not just normal autumn attire. It was a disguise. Likewise, the appearance of a vehicle at the site of an armed robbery and again at the location where items and people associated with that robbery were found could be a coincidence, or, as the warrant suggests, it could be that the vehicle "was used to transport [the people] to and from the robbery and may contain evidence of a crime." (Doc. 64-2 at 9.) Based on the totality of the circumstances, I find the warrant provided the judge with a substantial basis for concluding it was the latter. *See Edmiston*, 46 F.3d at 788.

### 4. The **Leon** *Good Faith Exception*

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to [an] invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

*Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*"; and (4)

when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (quoting *Leon*, 468 U.S. at 923; citing *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)) (emphasis in original).

Defendant Harden does not assert a *Leon* argument. (Doc. 62-1.) Further, I find that the detailed warrant in this case meets none of the four criteria outlined above. There is no indication that the affidavit contains a false or reckless statement or that the judge who signed the warrant totally abandoned the judicial role in issuing the warrant. As discussed above, the detailed affidavit is not so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable or so facially deficient that no police officer could reasonably presume it valid.

Therefore, even if the District Court disagrees with my conclusion regarding the validity of the warrant, I recommend the Court find officers' reliance on the warrant was objectively reasonable.

### 5. Conclusion

Based on the above discussion, I recommend denying Defendant Maxwell's Motion to Suppress. (Doc. 62.)

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant Maxwell's Motion to Suppress. **(Doc. 62.)** I also recommend that the District Court **DENY** Defendant Harden's Motion to Suppress. **(Doc. 73.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure

to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 1st day of October, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa