# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 21-CR-2013-CJW-MAR |
| vs. | **ORDER** |
| ANTIONE DEANDRE MAXWELL and CHAVEE E'LAUN HARDEN, | |
| Defendants. | |

## I. INTRODUCTION

This matter is before the Court on the Report and Recommendation ("R&R") of the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny each defendants' Motion to Suppress Evidence. (Doc. 92).

On June 2, 2021, defendant Maxwell filed a Motion to Suppress (Doc. 62). On June 28, 2021, defendant Harden also filed a Motion to Suppress. (Doc. 73). The government timely resisted each motion. (Docs. 64, 79). On July 29, 2021, Judge Roberts held a hearing on the motions (Doc. 85) and on October 1, 2021, Judge Roberts issued his Report and Recommendation ("R&R"), recommending that the Court deny both defendants' motions. (Doc. 92). On October 15, 2021, defendant Harden timely filed his objections to the R&R. (Doc. 94). On October 22, 2021, the government timely filed its response. (Doc. 97). Defendant Maxwell did not file objections.

For the following reasons, the Court **overrules** defendant Harden's objections, **adopts** Judge Roberts' R&R without modification, and **denies** defendants' Motions to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court

"'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district courts required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with

3

"clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus,

4

although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III. FACTUAL BACKGROUND

Based on the evidence submitted and testimony elicited at the suppression hearing, Judge Roberts made extensive factual findings. Defendants do not object to these findings, so the Court reviews them for plain error. On review, the Court finds that Judge Roberts thoroughly and accurately summarized the relevant facts in his R&R except as otherwise noted. (Doc. 92, at 4–6). Finding no plain error, the Court adopts and incorporates the R&R's factual findings without modification.

#### A. *The Armed Robbery on November 4, 2020*

On the night of November 4, 2020, G.H. and J.B. were victims of an armed robbery at their apartment on Shamrock Drive in Waterloo, Iowa. (Doc. 4, at 3). J.B. told police that she and G.H. were watching Netflix at the apartment when G.H.'s friend "Vae" 5 joined them. (Doc. 79-2, at 7). J.B. had met Vae five to six times previously. (*Id.* at 8). G.H. did not know Vae's full name. (*Id.*). J.B. described Vae as a black male with long "dreads" that he usually wore wrapped on the top of his head. (*Id.*, at 7-8). On this evening, Vae spent approximately 30-60 minutes with J.B. and G.H., much of the time Vae on his phone. (*Id.*, at 8). G.H. told officers that Vae usually drives a dark-colored SUV but thought Vae had arrived in his girlfriend's silver Malibu that night. (*Id.*, at 9).

As Vae started to leave the apartment, two men entered wearing black ski masks and carrying guns. J.B. said, "[T]he way it happened[,] there was no way [Vae] did not see them." (*Id.*, at 8). G.H. and J.B. described both men as black and said they wore dark-colored clothing and gloves. (*Id.*). Although both men wore black ski masks, G.H. could see the man who held a gun on him had hazel or blue eyes. (*Id.*). The man took G.H. to his bedroom where he "tore the room apart" looking for valuables and eventually found a bundle of approximately $1400 in cash under G.H.'s bed. (*Id.*). J.B. told officers the cash was wrapped with "a simple black hair tie." (*Id.*).

The other man pushed J.B. around the living room while holding a gun and asking her for valuable items. (*Id.*). The man grabbed the back

5

of J.B's shirt and asked her if "she was ready to die today." (*Id.*). He took her into her bedroom and asked for valuables. (*Id.*). At one point, the man hit J.B. on the right side of her face with the gun and on the left side of her face with his open hand. (*Id.*)

The men eventually told both J.B. and G.H. to lie on their stomachs on the living room floor and count to 100 while they left. (*Id.*, at 8-9). G.H. and J.B. reported the men left in a silver vehicle. (*Id.*, at 9). The intruders took approximately $1400 cash, a Nintendo Switch, and two iPhones. (*Id.*, at 8).

### B. The Traffic Stop and Foot Pursuit

That same evening, at approximately 9:40 p.m., Lt. Steven Bose, an 18-year veteran of the Waterloo Police Department, was sitting with his lights on at the intersection of Washington Street and 15th Street where Highway 218 runs through Waterloo, Iowa. A blue Chevrolet Trailblazer LS drove past his patrol car in the middle lane without slowing down or moving into the left lane in violation of Iowa law. Lt. Bose attempted to stop the Trailblazer, but the vehicle did not stop until it approached a red traffic light at Commercial Street. As the Trailblazer stopped, the front-seat passenger opened his door and fled on foot, dropping a black object that did not appear to be heavy. According to Lt. Bose, the front-seat passenger was a skinny black male wearing all dark clothing and dark shoes. Lt. Bose pursued the passenger on foot. The passenger ran fast and Lt. Bose tried to head him off on foot in the parking lot of a car dealership on Commercial near 10th Street. There are only a few houses on 10th Street. A silver vehicle backed into the driveway of the house farthest down the block and closest to the river—172 West 10th Street—momentarily caught Lt. Bose's attention while he was scanning the scene looking for the fleeing passenger. Lt. Bose noticed a black male standing on the driver's side of the vehicle with one of the doors open. (Doc. 79-2, at 5). The man did not appear to be wearing dark clothing, but Lt. Bose admits he did not look very closely. (Bose Hr'g Test). While pursuing the passenger, Lt. Bose had called for backup, and within a minute there were three or four officers on the scene.

Another officer eventually called Lt. Bose's attention to a black male in all-black clothing about midway down the block on 10th Street across the street from the car dealership. This man, Defendant Dennis Brown, Jr., told Lt. Bose that he had not run from him and Lt. Bose tended to believe him, in spite of the black clothing, because Defendant Brown was not out of breath. Nonetheless, Lt. Bose ordered Defendant Brown to the ground,

6

handcuffed him, and then walked him to his squad car to review his vehicle video. After reviewing the video, Lt. Bose released Defendant Brown because Defendant Brown was "thicker" than the man in the video, the man in the video was wearing dark blue jeans with "distress marks" or "wear marks" on the back pockets or back of the thighs and Defendant Brown was wearing jogging-style pants. Defendant Brown explained that he was in the area to visit a friend who lived on the block. Lt. Bose continued his search for the passenger.

Lt. Bose next located the blue Trailblazer about ten feet outside of the one-square block area where all of the above incidents occurred, parked at Commercial and 10th Streets. Officers looked through the open windows and observed in plain view a black ski mask, a pair of black gloves, and an iPhone. (Doc. 79-2, at 6). Lt. Bose walked to the area where the front-seat passenger had fled. He found a pair of cotton or soft-style black gloves on the road. The black clothing, ski masks, and gloves led Lt. Bose to suspect that the people in the Trailblazer had potentially committed a robbery, although he did not have any knowledge of a robbery at the time.

Just as Lt. Bose was picking up the black gloves, the police dispatcher ("dispatch") reported that an armed robbery had occurred at G.H. and J.B.'s apartment complex. Dispatch reported that two black males wearing all black clothing with masks and "soft cloth style gloves" robbed the victims at gun point. The robbery had occurred approximately 30 to 45 minutes prior to dispatch's report. One of the suspects was described as having hazel eyes.

Lt. Bose now believed that Defendant Brown might have been connected to the Trailblazer in some way. He testified that the most common route that someone would take from the location of the robbery to destinations north would be to take Orange to 218, and would include the location where he had initiated the traffic stop. This is the most direct route. Lt. Bose described this as a "common route."

Lt. Bose and Lt. Richter started walking north on 10th Street in search of Defendant Brown. As they were walking, they were approached by a female who told them she had found a set of keys by her vehicle on the ground. She found the keys in the same area where Lt. Bose had ordered Defendant Brown to the ground and detained him. Officers later determined that the keys belonged to the Trailblazer.

Lt. Bose and Lt. Richter continued walking and found Defendant Brown standing on the porch of 172 West 10th Street with a female later identified as R.S., Defendant Harden's girlfriend. Lt. Bose again detained

7

Defendant Brown to question him about the robbery because 172 West 10th Street was in the "direct route" taken by the passenger who had fled the Trailblazer.

Officers learned that Defendant Harden and R.S. rent the house and that Defendant Harden was the registered owner of the Trailblazer. Officers set up a perimeter around Defendant Harden and R.S.'s residence and secured the exterior of the house.

Lt. Richter then observed movement in the house. Specifically, Lt. Richter testified that he saw what appeared to be the shadow of a person through one of the windows descend "a possible flight of stairs." Based on his understanding of the circumstances that led them to the residence, Lt. Richter testified that he believed an armed suspect may have been in the residence. He also believed the two handguns used in the robbery might be in the house. In addition, he believed the getaway vehicle, the blue Trailblazer, was "right there, at 10th and Commercial;" that Defendant Brown, one of the suspects in the robbery, was apprehended on the porch of 172 West 10th Street; that because there was a time delay between the foot pursuit and when the robbery was reported, that people might have gone into 172 West 10th Street, including Defendant Brown, who was now in custody. Lt. Bose testified that he suspected Defendant Brown participated in the robbery, either as a robber or as the getaway driver. He also believed that there were two other suspects in the house: the passenger who fled from the Trailblazer and the unidentified man Lt. Bose saw near the Malibu when he earlier scanned the area from the car dealership looking for the passenger. Lt. Bose did not know that man's connection to the crime, if any, but he thought he would be in the house.

R.S., who was on the front porch of the residence, asked officers if she could go inside to get her two-year-old and four-month-old children. Lt. Bose and Lt. Richter testified that, for her own safety, for officer safety, and for the preservation of evidence, officers would not allow her back into the residence without an officer escort in spite of R.S. repeatedly telling officers she needed to go and see to her young, allegedly unattended children. (Gov. Ex. 3, at 1:20-12:30). This discussion went on for approximately eleven minutes. (*Id.*). Officers repeatedly told R.S. they believed her boyfriend was in the house and they needed to escort her inside for the protection of everyone in the house and the officers on scene. (*Id.*, at 11:40-45).

Officers eventually escorted R.S. into the house. Immediately upon entry, Lt. Richter saw Defendants Harden and Maxwell in the living room

8

with the four-month-old child, who was sitting in a swing. (*Id.*, at 12:59.) Lt. Richter told Defendants Harden and Maxwell to place their hands on their heads. (*Id.*, at 13:02). Lt. Richter went upstairs to sweep for additional people in the residence and locate the two-year-old. After finding the child and no one else, officers arranged for R.S. to stay with the children and for Defendants to be removed from the house.

During their protective sweep of the residence to secure it for a search warrant, officers only checked in areas where people could hide. However, officers saw a bundle of currency with a band wrapped around it and two scattered black tennis shoes on a landing near the side door of the residence leading to the basement. (Doc. 79-2, at 7). Next to the shoes was a "wood stock air rifle." (*Id.*). On a shelf directly above this landing was what appeared to be a pellet pistol or handgun. (*Id.*).

Defendant Maxwell, who originally said his name was Michael Hughes, appeared to match the physical description of the suspect who fled the Trailblazer; however, his clothing at the time of the sweep did not match the suspect's clothing. Further, Defendant Maxwell had hazel eyes, consistent with dispatch's description of one of the robbery suspects. Officers escorted Defendants Brown, Harden, and Maxwell to the Waterloo Police Station for further investigation. Officers towed the Trailblazer from the scene until they could secure a warrant to search it.

In post-Miranda statements to police officers, Defendant Maxwell admitted that he had lied about being named "Michael Hughes." (Doc. 4, at 10). He also admitted that he was the passenger who fled the Trailblazer on foot during the attempted traffic stop and that he had changed clothes at Defendant Harden's residence. (*Id.*). Defendant Harden admitted in post-Miranda statements that he went to J.B. and G.H.'s apartment on the evening of November 4, 2020 for the purpose of buying marijuana, and that he was present when two males burst through the front door and began to rob J.B. and G.H. (*Id.*). Defendant Harden further stated that he lent his blue Trailblazer to Defendant Brown earlier that day. (*Id.*). Defendant Harden said he received a ride to the apartment from F.A. (*Id.*). F.A. denied giving Harden a ride to the apartment. (*Id.*).

### C. The Search Warrants

Officers obtained State of Iowa search warrants in the late evening hours of November 4, 2020 into the early hours of November 5, 2020 for (1) Defendant Harden's and R.S.'s residence at 172 West 10th Street, Waterloo, Iowa (Doc. 79-2); (2) Defendant Harden's Trailblazer (Doc. 79-3), and (3) Defendant Maxwell's 2007 silver Chevrolet Malibu (Doc. 64-

9

2). The warrants also authorized authorities to take buccal swabs, photographs, and the clothing of Defendants Brown, Harden, and Maxwell. Inside Defendant Harden's residence, officers recovered, among other items, a wallet with Defendant Maxwell's state identification card; a blue hooded sweatshirt; black shoes; commercially packaged marijuana products; multiple containers with plant material; THC edibles; drug paraphernalia; three cell phones; $130.00, $1,741.00, $45.00, and $5.00 in United States currency; credit and debit cards; rubber bands; and a black hair tie with hair. (Doc. 79-2, at 11).

Inside Defendant Harden's Trailblazer, officers recovered, among other items: a pair of black gloves, a ski mask, and a black iPhone. (Doc. 79-3, at 11). Officers also collected five swabs from the interior of the vehicle. (*Id.*). Inside Defendant Maxwell's Malibu, officers recovered the following items: a Heritage Arms Rough Rider .22 caliber revolver; an HS Produkt .45 caliber handgun; a green tote with THC oil/was [sic] products; a white garbage sack containing several packages of plant material; and blue containers with plant residue and raw papers; a receipt for THC products; and a prescription bottle with pills. (Doc. 64-2, at 11).

### D. Subsequent Interviews of J.B. and G.H.

Early on November 5, 2020, officers conducted additional interviews with J.B. and G.H. at the Waterloo Police Station where they both identified "Vae" as Defendant Harden during photo lineups. (Doc. 4, at 9-10). At later interviews, J.B. and G.H. admitted they had purchased the marijuana from a dispensary in Colorado that was stolen in the robbery. (*Id.*, at 10). They admitted they had intended to sell some of it in Iowa and G.H. further admitted that the cash stolen from under his bed during the robbery was proceeds from marijuana sales. (*Id.*). Video footage from the marijuana dispensary in Denver confirms that J.B. and G.H. purchased the marijuana in October 2020. (*Id.*).

(Doc. 92, at 4–12).

## IV. ANALYSIS

Judge Roberts considered both defendants' motions to suppress in his R&R. As to defendant Maxwell's motion, Judge Roberts found that (1) the warrant to search the silver Malibu contained sufficient information to provide the issuing judge with a substantial basis to conclude that the Malibu may contain evidence of a crime and (2) even

10

if the warrant was deficient, law enforcement officers' reliance on the warrant was not unreasonable. The time to object to the R&R has expired, and neither defendant Maxwell nor the government has filed any objections to the R&R as it pertains to defendant Maxwell. Thus, these parties have waived their right to a de novo review of Judge Roberts' findings on defendant Maxwell's motion. *See, e.g.*, *United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 2001) ("Appellant's failure to file any objections waived his right to de novo review by the district court of any portion of the report and recommendation of the magistrate judge as well as his right to appeal from the findings of fact contained therein." (citation and internal quotation marks omitted)). Accordingly, the Court reviews Judge Roberts' R&R as to defendant Maxwell's motion for plain error. *Id.* The Court finds no plain error in Judge Roberts' decision. Thus, the Court **adopts** the legal conclusions in the R&R. Defendant Maxwell's Motion to Suppress is **denied**.

As to defendant Harden's motion, Judge Roberts found that (1) law enforcement officers possessed sufficient information to establish probable cause that the suspects from the armed robbery would be located inside defendant Harden's house, (2) the circumstances were sufficiently exigent to justify the warrantless entry into the house, (3) the initial protective sweep of the house was justified, (4) law officers would have inevitably discovered the evidence in the house absent any alleged Fourth Amendment violation, (5) the warrant to search the house constituted an independent source of probable cause, and (6) that the *Leon* good faith exception applies in any event.

Defendant Harden's objections are limited to Judge Roberts' conclusions that (1) probable cause existed to believe that evidence of the armed robbery would be found in the house and (2) exigent circumstances existed to justify a warrantless entry into the house. (Doc. 94, at 3–5). The Court therefore reviews these portions of the R&R de novo.

11

## A. *Probable Cause*

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, or effects, against unreasonable searches or seizures." The "very core" of the protections established by the Fourth Amendment is "right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). The Fourth Amendment does not impede all investigations on private property, however. Law enforcement may search a person's home when armed with a valid warrant. A warrant is not always necessary, however, "because the ultimate touchstone of the Fourth Amendment is reasonableness." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (cleaned up). Accordingly, law enforcement officers may search a person's home without a warrant under any of a handful of carefully drawn and well-delineated exceptions to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). In order to justify the search in either scenario—either to obtain a warrant or invoke some exception—the law enforcement officer must have probable cause to believe evidence of a crime will be discovered in the place to be searched. *See* U.S. Const. amend. IV ([A]nd no Warrants shall issue, but upon probable cause. . . ."); *United States v. Kleinholz*, 339 F.3d 674, 676 (8th Cir. 2003) (describing the exigent circumstances exception).

Probable cause exists if, based on the totality of the circumstances, a showing can be made "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). "The probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). Accordingly, when making a probable cause determination, law enforcement officers are entitled to draw on the totality of the

circumstances confronting them, *Florida v. Harris*, 133 S.Ct. 1050, 1052 (2013), and may "draw inferences based on [their] own experience[s]." *Ornelas v. United States*, 517 U.S. 690, 700 (1996). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted). Thus, the probable cause standard is neither rigid nor particularly high. "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 176 (1948) (internal citations and quotations omitted).

Defendant Harden objects to Judge Roberts' conclusion that law enforcement officers had probable cause to believe evidence of the armed robbery would be located inside defendant Harden's house. (Doc. 94, at 3–4). Specifically, defendant asserts that the "totality of the circumstances failed to support any conclusion that the armed robbery suspects would be found in" defendant Harden's house. (*Id.*, at 3). Defendant Harden avers that the evidence "established only that a suspicion of a potential connection of the residence to the alleged crime." (*Id.*).

In making this objection, defendant Harden either miscalculates the weight of the information available to law enforcement officers or misunderstands the probable cause standard. As Judge Roberts noted, the facts here are indeed complicated. (Doc. 92, at 4). The events of the evening of November 4, 2020, involved a number of moving parts and required law enforcement officers to piece together often fleeting and seemingly disparate facts and observations. Even so, after considering the quantum of information available to law enforcement officers and the relatively low standard that constitutes probable cause, the Court agrees that there was sufficient evidence to establish probable cause that evidence of the armed robbery would be located within defendant Harden's house.

13

First, the officers had ample reason to suspect that the occupants of the blue Trailblazer were involved in the robbery. Officers logically linked the Trailblazer to the robbery by the evasive behavior of its occupants as well as their observation of gloves and a ski mask inside the vehicle and the gloves dropped in the road. It is true that these observations were made before the officers had knowledge of the robbery, but they were completely justified in connecting those dots after the fact in their attempt to interdict the robbers.

Second, officers located one of the suspects, Dennis Brown, on the property. Despite initially dismissing Brown as a suspect, over time the officers developed good reason to suspect his involvement. A citizen informed the officers that she had found a set of keys on the ground where they initially apprehended Brown—keys that belonged to the blue Trailblazer. The officers had previously located the blue Trailblazer they had attempted to stop parked within close proximity to defendant Harden's house. The officers eventually apprehended Brown on the front porch of defendant Harden's house, which the officers assessed to be located along the likely route of escape from the robbery.

Third, officers knew from dispatch that the armed robbery involved multiple suspects. Based on the report, their search was not complete simply because they had arrested Brown. Given the recency of the robbery and the fact that they had just apprehended someone they believed to be involved, they had every reason to believe that the other suspects were nearby.

Finally, the house itself was a rational place for officers to infer that the suspects would be located. One suspect had already been located there. The house was located along a logical escape route away from the scene of the robbery. The vehicle that officers reasonably believed had been used in the escape was located nearby. Officers also observed a moving shadow through one of the windows, so they had reason to believe there were other people in the house.

14

As stated above, officers were undoubtedly attempting to piece together a complex sequence of events that night. Based on the totality of the circumstances and the officers' reasonable interpretations of the facts they had at their disposal—and in light of their training and experience—the Court agrees with Judge Roberts that there was probable cause to suspect that evidence of the crime would be located within defendant Harden's house. Defendant Harden's motion on this ground is **denied.**

### B. *Exigent Circumstances*

Defendant Harden further objects to Judge Roberts' conclusion that exigent circumstances existed sufficient to justify law enforcement officers' entry into defendant Harden's home. (Doc. 94, at 4–5). Under the exigent circumstances exception, officers may enter a person's home without a warrant "when the exigencies of the circumstances make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. *King*, 563 U.S., at 460 (cleaned up). Which circumstances are so dire as to justify jettisoning otherwise ironclad strictures of the Fourth Amendment is a matter of some debate. The United States Supreme Court has held that "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect and occupant from imminent injury. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent an exigency or emergency." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Officers in hot pursuit of a fleeing suspect may also enter into a person's home without a warrant. *United States v. Santana*, 427 U.S. 38, 42–43 (1976). Officers may also disrupt the sanctity of a person's castle "to prevent the imminent destruction of evidence." *Brigham City*, 547 U.S. at 403.

Defendant Harden argues that the observation of a shadow was insufficient to justify the officer's belief that evidence might be destroyed absent an immediate entry.

(*Id.*, at 4). Defendant Harden asserts that the children believed to be present were not in danger because "the concern for a firearm [present in the home] was a generalized concern, but not specific." (*Id.*, at 5). Defendant Harden also asserts that no one was injured or being threatened with injury, concluding that "[t]here was no necessity of aid." (*Id.*).

Defendant Harden's objections are unavailing. In most cases, law enforcement officers attempt to justify their warrantless entry based on one of the above-mentioned circumstances. Here, officers were presented with numerous facts which justified their entry under the exigent circumstances exception. First, officers faced a situation where young children might be in danger. R.S. told officers there were two young children in the house. Officers already had probable cause to believe that the house was in some way associated with an armed robbery, itself a violent act. They had arrested a suspect, Brown, on the premises and suspected that others were inside. Officers did not recover a firearm from Brown, so they had reason to believe that the firearms used in the robbery were still inside the residence, either with the other suspects or at least accessible by the children. Thus, on the one hand, the children may be in the home with armed and potentially violent criminals. On the other hand, they may be in the home alone with evidence of the crime which officers knew to include firearms. Either of these scenarios are sufficient to trigger the exigent circumstances exception. *See United States v. Sanders*, 4 F.4th 672, 677–78 (8th Cir. 2021) (finding entry into home reasonable where domestic violence suspect presented a threat to children); *United States v. Henderson*, 553 F.3d 1163, 1165 (8th Cir. 2009) (finding entry into room reasonable to secured firearm, even though suspect already in custody).

Second, officers had reason to believe both that evidence of the robbery and other people remained inside the house. Although they arrested one suspect and recovered some gloves possibly used in the crime, there was plenty of other evidence yet

16

unaccounted for. The police could therefore reasonably assume that the firearms would be located inside, as well as the proceeds of the robbery or cell phones used to coordinate the robbery. With this evidence still in question and at least one other suspect potentially inside the home, officers had good reason to fear that the evidence may be destroyed while they waited for a warrant. The firearms would have been difficult to destroy, but they could easily have been wiped of fingerprints or DNA linking them to the robbery. Further, the cash proceeds could quickly be disposed. Preventing the destruction of such evidence is a legitimate exercise of law enforcement's responsibility to preserve order and has long been held to be constitutional. *See Segura v. United States*, 468 U.S. 796, 810 (1984).

Even if the Court were to grant Harden's specific objections, he omits a significant finding in the R&R which is salient to this issue. Judge Roberts based his conclusion not only on the matters of child safety and preservation of evidence, but also on the potential threat that armed suspects in the home presented to law enforcement officers. (Doc. 92, 24–25). The potential presence of firearms, the officers' belief that a suspect was still inside the house, the threats made by the suspects to the victims of the robbery indicating that they were ready and willing to commit acts of violence, and the inherently violent nature of the crime being investigated all combine to present an exigent circumstance justifying the entry into defendant Harden's house. *See United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003). Defendant Harden's motion on this ground is **denied**.

  C. *Remaining Conclusions*

Having reviewed de novo and disposed of the objected-to portions of the R&R, the Court turns its attention to the unobjected portions of the R&R. Finding no clear error in Judge Roberts' conclusions, the Court adopts his findings without modification.

## V. CONCLUSION

For the reasons stated above, defendant Harden's objections are **overruled**. (Doc. 94). The Court **adopts** Judge Roberts' Report and Recommendation without modification (Doc. 92) and **denies** defendants' Motions to Suppress (Docs. 62 & 73).

**IT IS SO ORDERED** this 28th day of October, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa